No. 13-1708

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

Kimberly Spurling,
Plaintiff-Appellant,

v.

C&M Fine Pack, Inc.,
Defendant-Appellee.

_____

Appeal From The United States District Court
For the Northern District of Indiana
Case No. 1:11-cv-00039-PPS
The Honorable Judge Philip P. Simon

_____

BRIEF AND REQUIRED SHORT APPENDIX OF
PLAINTIFF-APPELLANT, KIMBERLY SPURLING

_____

ROCKWELL & JANSEN LLC
Lori W. Jansen
Attorney for the
Plaintiff-Appellant, Kimberly Spurling
812 Mill Lake Road
Fort Wayne, Indiana 46845
Phone: (260) 338-2784
Fax: (260) 338-2786
Email: lorijansen@rockwelljansen.com

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 13-1708

Short Caption: Kimberly Spurling v. C&M Fine Pack, Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

 Kimberly Spurling

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Rockwell & Jansen LLC

(3) If the party or amicus is a corporation:

   I) Identify all its parent corporations, if any; and


   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:



Attorney's Signature:  s/ Lori W. Jansen                    Date:  April 15, 2013

Attorney's Printed Name:  Lori W. Jansen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** _X_      **No** ___

Address:  812 Mill Lake Rd.
                Fort Wayne, IN 46845

Phone Number:  260-338-2784                    Fax Number:  260-338-2786

E-Mail Address:  lorijansen@rockwelljansen.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................. iv-vi

I.      JURISDICTIONAL STATEMENT................................................. 1

II.     STATEMENT OF THE ISSUES PRESENTED FOR REVIEW......... 1

        A.      Whether the trial court erred when it failed to acknowledge the unequivocal notice test and found that Spurling was terminated on April 16, 2010, thus construing all facts in favor of C&M by discounting the many intervening events in Spurling's favor that occurred before Spurling was notified verbally and in writing that she was terminated on April 28, 2010............................................. 1

        B.      Whether the trial court erred when it found that it did not need to make a determination as to whether Spurling was disabled, regarded as or had a record of disability because Bellant's ignored April 16, 2010 termination recommendation was made prior to his receipt of Spurling's physician's paperwork designating Spurling as suffering from a disability protected by the ADAAA......................................................... 1

        C.      Whether the trial court erred when it found that Spurling was not entitled to the interactive process to determine a reasonable accommodation, because Bellant's first ignored recommendation to terminate was made prior to Bellant's receipt of Spurling's physician's medical documentation designating Spurling as suffering from a disability protected by the ADAAA.................................................... 1

        D.      Whether the trial court erred when it found that C&M's termination of Spurling did not interfere with Spurling's request for a leave of absence pursuant to the Family and Medical Leave Act when Spurling testified that she asked for time off of work to complete her medical testing, Spurling's physician noted on his paperwork that additional medical testing was in progress and C&M had already placed Spurling on a leave of absence................................................. 2

III.   STATEMENT OF THE CASE................................................  2

IV.   STATEMENT OF THE FACTS............................................   3

V.   SUMMARY OF ARGUMENT...........................................  12

VI.   ARGUMENT..............................................................  14

    A.   Introduction...................................................  14

    B.   Standard of Review........................................  15

        1.   Summary Judgment.............................  15

        2.   Motion to Alter/Amend Judgment..........  15

    C.   The trial court erred when it failed to acknowledge
the unequivocal notice test.................................. 16

        1.   Spurling's date of termination is April 28, 2010
per the unequivocal notice test................................. 16

        2.   Spurling's termination date per *Bultemeyer*............. 19

    D.   The trial court erred when it found that it did not need
to make a determination as to whether Spurling was
disabled, regarded as or had a record of disability............. 21

        1.   Actual disability does not require a final diagnosis..  21

        2.   C&M had knowledge of Spurling's disability............ 23

        3.   Spurling is substantially limited in one or more
major life activities................................... 27

        4.   Spurling has a record of disability........................... 28

        5.   Spurling was regarded as disabled......................... 30

        6.   Spurling was qualified to perform her job............... 32

        7.   Spurling's termination was an adverse
employment action................................... 35

E.    The trial court erred when it found that Spurling was not entitled to the interactive process to determine a reasonable accommodation.................................................. 36

    1.    C&M failed to offer reasonable accommodations...... 36

    2.    C&M failed to engage in the interactive process....... 39

F.    The trial court erred when it found that C&M's termination of Spurling did not interfere with Spurling's Right to FMLA leave.......................................................... 45

    1.    Spurling was entitled to FMLA leave based on her serious health condition.......................................... 46

VII.    CONCLUSION............................................................. 51

SHORT APPENDIX.............................................................. 53

    Court's Opinion and Order dated July 18, 2012, denying Spurling's motion for summary judgment and granting C&M's motion for summary judgment........................... 54

    Clerk's Entry of Judgment dated July 19, 2012........................... 72

    Court's Opinion and Order dated February 21, 2013, denying Spurling's motion to alter/amend judgment................... 73

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. RULE 32(a)(7)(B)(1)...................................................... 87

CIRCUIT RULE 30(d) CERTIFICATION.................................. 88

CERTIFICATE OF SERVICE................................................. 89

## <u>TABLE OF AUTHORITIES</u>

**CASE LAW:**

*Adkins v. Briggs & Stratton,* 159 F.3d 306 (7th Cir. 1998)..................................... 24, 25

*Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)............

.......................................................................................... 38, 40, 44

*Bultemeyer v. Fort Wayne Comm. Schools*, 100 F.3d 1281 (7th Cir. 1995).............

.......................................................................... 20, 34, 37, 38, 40, 43, 44

*Burnett v. LFW Inc.,* 472 F.3d 471, 477 (7th Cir. 2006)........................................ 46, 47

*Byrne v. Avon Prods., Inc.,* 328 F.3d 379, 381 (7th Cir. 2003)............................ 46, 47, 48

*Carmona v. Southwest Airlines Co.,* 604 F.3d 848, 855 (5th Cir. 2010)...................... 27

*Cigan v. Chippewa Falls Sch. Dist.,* 388 F.3d 331, 335 (7th Cir. 2004)............. 30

*Dvorak v. Mostardi Platt Assocs., Inc.,* 289 F.3d 479, 486 (7th Cir. 2002)..... 16, 17, 21, 36

*EEOC v. Lee's Log Cabin*, 546 F.3d 438, 442 (7th Cir. 2008)...................................... 35

*EEOC v. Sears Roebuck & Co.,* 417 F.3d 789 (7th Cir. 2005)................................... 36

*El-Gazawy v. Holder*, 690 F.3d 852, 857.................................................... 16

*Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1066 (7th Cir. 2008)............. 36

*Flannery v. Recording Indus. Ass'n of Am.,* 354 F.3d 632, 637-38 (7th Cir. 2001)...... 17

*Goelzer v. Sheboygan County, Wis.,* 604 F.3d 987, 993 (7th Cir. 2010)...................... 46

*Hammon v. DHL Airways, Inc.,* 980 F.Supp. 919, 926 (S.D. Ohio 1997)................... 22

*Haywood v. Lucent Techs., Inc.*, 323 F.3d 524 (7th Cir. 2003)................................... 35

*Hedberg v. Ind. Bell Tele. Co., Inc.,* 47 F.3d 928, 931 (7th Cir. 1995)........ 22, 23, 24, 33

*Kolivas v. Credit Agricole*, 1996 WL 684167, *3 (S.D.N.Y. Nov. 26, 1996),

*aff'd*, 125 F.3d 844 (2nd Cir. 1997)........................................................... 25, 26

*Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005)................... 30

*Lever v. Northwestern Univ.*, 979 F.2d 552, 554 (7th Cir. 1992).............................. 17

*Mull v. ARCO Durethene Plastics, Inc.,* 784 F.2d 284, 288 (7th Cir. 1986)................. 17

*Muratoski v. Holder*, 622 F.3d 824, 830 (7th Cir. 2010).............................................. 16

*Pagen v. Tin Inc.*, 695 F.3d 622, 624 (7th Cir. 2012)................................................... 15

*Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011)................................ 15

*Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005).............................. 29

*Schmidt v. Safeway Inc.,* 864 F.Supp. 991, 997 (D. Or. 1994)............................. 22, 23

*Seener v. Northcentral Tech. Coll.,* 113 F.3d 750, 757 (7th Cir. 1997)........................ 15

*Servatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 n.1 (7th Cir. 2010)............. 21

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200-01,

    122 S.Ct. 681, 693, 151 L.Ed.2d 615 (2002)............................................ 28

**STATUTORY AUTHORITY:**

28 U.S.C. § 1291..................................................................................... 1

28 U.S.C. § 1331..................................................................................... 1

28 U.S.C. § 1343(a)(4).............................................................................. 1

29 C.F.R. § 825.113(a)............................................................................. 47

29 C.F.R. § 825.113(c)............................................................................. 47, 48

29 C.F.R. § 825.115................................................................................. 49

29 C.F. R. § 825.115(c)(3)......................................................................... 47

29 C.F.R. § 1630 app................................................................................ 36

29 C.F.R. § 1630.2 (1).............................................................................. 30, 31, 32

29 C.F.R. § 1630.2(i)(1)(i)(ii)............................................................................... 27

29 C.F.R. § 1630.2 (j)(1)(i)................................................................................... 28

29 C.F.R. § 1630.2(j)(1)(v)................................................................................... 28

29 C.F.R. § 1630.2(j)(1)(vii)................................................................................ 27

29 C.F.R. § 1630.2 (k)......................................................................................... 29

29 C.F.R. § 1630.9(e).......................................................................................... 36

29 U.S.C. § 2654.................................................................................................. 1

42 U.S.C. § 12102(4)(D)...................................................................................... 29

42 U.S.C. § 12111................................................................................................. 1

42 U.S.C. § 12111(8)........................................................................................... 32

42 U.S.C. § 12112(a)...................................................................................... 21, 32

42 U.S.C. § 12112(5)........................................................................................... 36

42 U.S.C. § 12201(h)........................................................................................... 32

**CIRCUIT RULES:**

Circuit Rule 3(c)(1)................................................................................................ 1

**RULES OF CIVIL PROCEDURE:**

Fed. R. Civ. P. 59(e)........................................................................................... 15

**OTHER:**

76 Fed. Reg. 16978............................................................................................. 31

# I.  <u>JURISDICTIONAL STATEMENT</u>

This action was authorized and commenced pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12111. *et seq.,* as amended ("ADAAA"), and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2654, *et seq..* The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and §1343(a)(4). Spurling appeals the District Court's July 19, 2012 Order granting summary judgment in favor of defendant-appellee, and its final February 21, 2013 Order denying plaintiff-appellant's motion to alter/amend judgment. Spurling timely filed a notice of appeal on March 20, 2013 pursuant to Circuit Rule 3(c)(1). This court has jurisdiction pursuant to 28 U.S.C. §1291.

# II.  <u>STATEMENT OF THE ISSUES</u>

A.  Whether the trial court erred when it failed to acknowledge the unequivocal notice test and found that Spurling was terminated on April 16, 2010, thus construing all facts in favor of C&M by discounting the many intervening events in Spurling's favor that occurred before Spurling was notified verbally and in writing that she was terminated on April 28, 2010.

B.  Whether the trial court erred when it found that it did not need to make a determination as to whether Spurling was disabled, regarded as or had a record of disability because Bellant's ignored April 16, 2010 termination recommendation was made prior to his receipt of Spurling's physician's paperwork designating Spurling as suffering from a disability protected by the ADAAA.

C.  Whether the trial court erred when it found that Spurling was not entitled to the interactive process to determine a reasonable accommodation, because Bellant's first ignored recommendation to terminate was made prior to Bellant's receipt of Spurling's

1

physician's medical documentation designating Spurling as
suffering from a disability protected by the ADAAA.

D.     Whether the trial court erred when it found that C&M's
termination of Spurling did not interfere with Spurling's request for
a leave of absence pursuant to the Family and Medical Leave Act
when Spurling testified that she asked for time off of work to
complete her medical testing, Spurling's physician noted on his
paperwork that additional medical testing was in progress and
C&M had already placed Spurling on a leave of absence.

## III.    <u>STATEMENT OF THE CASE</u>

On or about May 24, 2010, Plaintiff/Appellant, Kimberly Spurling
(hereinafter "Spurling") filed a charge of discrimination with the Equal
Employment Opportunity Commission alleging that C&M Fine Pack, Inc.
("C&M") discriminated against her in violation of the American's with
Disabilities Act.  On December 7, 2010, Spurling filed a complaint and jury
demand in Fort Wayne, Indiana, Allen Superior Court, alleging disability
discrimination pursuant to the Americans with Disabilities Act ("ADAAA"), as
amended, for her actual and perceived disability, record of impairment, and
failure of the interactive process to find a reasonable accommodation, and a
second claim of interference pursuant to the Family and Medical Leave Act
(FMLA"). C&M removed the case to federal district court on January 26, 2011.

Spurling worked satisfactorily for C&M as an assembly line packer from
2004until the spring of 2009 when Spurling's coworkers began to notice that
Spurling was exhibiting signs of decreased consciousness, which resulted in

2

disciplinary warnings. During an April 15, 2010 meeting with management personnel, Spurling received a Final Warning / Suspension pending termination. Spurling was told by the HR manager, Paul Bellant ("Bellant"), that Spurling should contact him before Monday if Spurling thought of any information that might affect C&M's decision.

Spurling did call Bellant the following day to inform C&M that her performance issues might be related to a medical condition. Bellant gave Spurling paperwork for her physician to complete, which Spurling returned on April 21. The physician found that Spurling was suffering from a disability protected under the ADA, and further noted that additional medical testing was in progress. After corporate management reviewed the physician's paperwork, but without speaking to the doctor or to Spurling, the decision was made to take an "aggressive approach" and terminate Spurling on April 28, 2010.

Spurling received a definitive diagnosis of narcolepsy approximately one month after her termination. With medication, Spurling displays no symptoms of the narcolepsy and needs no reasonable accommodation to work.

## IV.    **STATEMENT OF THE FACTS**

Spurling began her employment with C&M Fine Pack in February 2004 as a Forming Inspector/Packer assigned to third shift. (DE 22-1 p. 1; DE 27-4 pp. 4-5 (Rog 6).) In 2009, Spurling's co-workers and supervisors began to notice

3

that she was exhibiting signs of decreased consciousness or alertness. (DE 22-1 p. 2; DE 27-1 p. 2; DE 27-5; DE 27-7 thru DE 27-9; DE 27-12; DE 27-27.) The pattern of Spurling's loss/decrease of consciousness incidents continued to develop, and Spurling began to receive disciplinary warnings for them. (DE 22-1 p. 2; DE 27-1 p. 2; DE 27-5; DE 27-6 thru DE 27-8.) Spurling received a Final Warning/Suspension for an incident that occurred on February 15, 2010. (DE 22-1 p. 2; DE 27-1 p. 2; DE 27-10.) On that date, Spurling left her work site to use the bathroom and did not return. (*Id.*) After twenty (20) minutes a co-worker located Spurling in the bathroom, roused her with effort and indicated concern as to whether Spurling was okay. (*Id.*)

On February 24, 2010, Spurling met with the plant manager, Darrin Claussen ("Claussen"), supervisors Kurt Meyer, Robin Hively, and Jim Cardenas ("Cardenas") in a return from suspension meeting. (DE 22-1 p. 2; DE 27-1 p. 2; DE 27-11.) Claussen's meeting notes reflect that Spurling indicated that her falling asleep was related to a new medication which had subsequently been changed by her doctor. (*Id.*) At the meeting, Spurling produced a note from her doctor, which included the following language, "Pt was recently asked to discontinue medicine related to her passing out - please excuse symptoms @ work." (DE 22-1 p. 2; DE 27-1 p. 2; DE 27-19.)

Spurling continued to have problems with consciousness while at work. (DE 22-1 p. 3; DE 27-1 p. 3; DE 27-12.) On April 12, 2010, Spurling's shift

supervisor, Cardenas, again reported Spurling for being "completely asleep when she was packing parts." (DE 22-1 p. 3; DE 27-1 p. 3; DE 27-12 p. 1.) This report was based on two (2) complaints that Spurling's supervisors had received during the shift. (*Id.;* DE 27-12 pp. 2 & 3.) Cardenas expressed concern for Spurling's safety and the lack of improvement in her wakefulness. (*Id.;* DE 27-12 p. 1.)

On April 15, 2010, Spurling attended a meeting with management personnel during which Spurling received a Final Warning/Suspension pending termination. (DE 22-1 p.3; DE 27-1 p. 3; DE 27-13; DE 27-14.) Bellant's notes of the meeting document that Spurling had "no recollection of falling asleep or nodding out." (DE 27-14.) During their depositions, Human Resources Manager, Paul Bellant ("Bellant"), C&M's Vice President of Human Resources, Jeff Swoyer ("Swoyer"), and Claussen each testified that Spurling was terminated as of the April 15 meeting. (DE 22-1 p. 3; DE 27-1 p. 3; DE 27-29 p. 4 (22)[1]; DE 27-31 pp. 4-7 (8-21); DE 27-30 pp. 4-5 (15-20).)  C&M's documentation of what actually transpired during and after the April 15 suspension meeting contradicts the C&M managers' testimony.[2] (DE 22-1 p. 3;

---

[1] Because the deposition transcripts are in condensed format, the actual pages of the deposition will be listed in parenthesis after DE page number.

[2] C&M's responses to Spurling's requests for production of documents were sent on May 20, 2011. Bellant, Claussen and Swoyer were deposed on October 13, 2011. The email exchange between the deponents, as documented in DE 27-20 thru DE 27-25, were not provided to Spurling's counsel until

5

DE 27-1 p. 3;DE 27-2; DE 27-3; DE 27-15; DE 27-20 thru DE 27-25; DE 27-29 pp. 4-5, 7, 9 (22-24, 37, 60-61); DE 27-31 pp. 4-7 (8-21).) Contrary to Bellant's testimony that Spurling was terminated as of April 15, before the April 15 meeting ended Bellant informed Spurling verbally and in writing that she should contact him with any information which might affect C&M's ultimate decision before Monday, April 19. (DE 22-1 pp. 3-4; DE 27-1 pp. 3-4; DE 27-29 p. 3 (17); DE 27-14.) Bellant testified that it was typical for C&M to wait almost two weeks for new information to be produced for consideration in a termination situation. (DE 22-1 p. 4; DE 27-1 p. 4; DE 27-29 p. 12 (80).)

On April 16, 2010, Spurling phoned Bellant and informed him that her performance issues might be related to a medical condition. (DE 22-1 p. 4; DE 27-1 p. 4; DE 27-29 pp. 3-5 (17, 23-24); DE 27-32 pp. 5 (66-67).) Bellant met with Spurling later that same day, and gave her a letter regarding the Americans with Disabilities Act ("ADA") and documentation for Spurling's physician to complete. (DE 22-1 p. 4; DE 27-1 p. 4; DE 27-29 p.3 (17-18); DE 27-2; DE 27-3; DE 27-32 p. 5 (68).) The C&M paperwork indicated that the completed paperwork should be returned "no later than Friday, April 30, 2010." (DE 22-1 p.4; DE 27-1 p. 4; DE 27-2.)

When Spurling picked up the C&M paperwork on April 16, 2010, she requested time off to complete the additional medical work up "to see what

---

October 21, 2011, eight days after the depositions. (DE 22-1 p. 3, fn.2.)

[her] problem was; why [she] was falling asleep." (DE 22-1 p. 4; DE 27-1 p. 4; DE 27-32 p. 3 (55-56).) Bellant, however, denies that Spurling requested time off. (DE 22-1 p. 4; DE 27-1 p.4; DE 27-29 p. 5 (25-27).) Bellant testified that Spurling was not eligible for either FMLA leave or C&M emergency personal leave because she was facing a suspension, pending termination of employment. (DE 22-1 p. 4; DE 27-1 p. 4; DE 27-29 p. 10 (64-66); DE 27-16.)

That same day, April 16, 2010, after communicating with Spurling regarding the ADA both verbally and in writing, and giving Spurling paperwork for her physician to complete, Bellant contacted Swoyer regarding Spurling. (DE 22-1 pp. 4-5; DE 27-1 pp. 4-5; DE 27-20.) In a lengthy and comprehensive email, Bellant informed Swoyer of two (2) things: First, Bellant informed Swoyer that Swoyer's authorization was required to terminate Spurling. (*Id.)* Second, contrary to his deposition testimony that Spurling would not be entitled to a leave, Bellant informed Swoyer that Bellant had placed Spurling on a leave of absence. (*Id.*)

> As our practice when we are terminating an employee for safety / performance / policy / issues, we submit the information to corporate for final authorization. . .
>
> Just received a phone call from Kim Spurling that she may have a medical condition that is causing this issue. I have ADA paperwork that she will have her doctor fill out to begin the interactive process regarding her ability to perform the key functions of her job safely. I will put her on a LOA until process is completed.

(DE 27-20.)

Swoyer replied to Bellant's email with a cryptic reference to the ADA and

FMLA:

> I find interesting that after all of the discussion sessions and
> conversations along the way that she waited until the point of
> termination to try to establish her eligibility for protection under
> either FMLA or ADA. Please keep me informed. This is one we may
> refer to counsel for guidance.

(DE 22-1 p. 5; DE 27-1 p. 5; DE 27-21.)

Recommending termination was the maximum action Bellant could take

with respect to Spurling. (DE 22-1 p.5; DE 27-1 p. 5; DE 27-29 pp. 2, 11

(7,77).) Bellant's power as the local HR Manager was limited to hiring

employees and recommending termination to corporate-level HR. (*Id.*) Swoyer

confirmed that Bellant was only able to make recommendations and further

asserted that he had overruled Bellant's recommendations for termination on

"several occasions." (DE 22-1 p. 5; DE 27-1 p. 5; DE 27-31 p. 5 (12-13).)

Spurling met with her physician, Dr. Beitzel, on April 21, 2010, and he filled

out the C&M medical paperwork. (DE 22-1 pp. 5-6; DE 27-1 pp. 5-6; DE 27-3,

p.2.) In response to question 1, "Does this employee listed above have a mental

or physical disability covered under the Americans with Disabilities Act (ADA),"

Dr. Beitzel checked "Yes" and wrote, "pt has excessive drowsiness that affects

her job." (*Id.*) In response to question 2 concerning the essential job functions

of Spurling's job, the physician indicated that Spurling may not be able to

perform the essential job functions itemized and attached to the C&M

paperwork. (*Id.*) For purposes of reasonable accommodation, Spurling's physician recommended, "periods of scheduled rest." (*Id.*) Finally, Spurling's physician wrote at the bottom of the form, "add'n medical work up in progress." (*Id.*)

When Spurling left her physician's office on April 21, 2010, she immediately returned the completed C&M paperwork to Bellant. (DE 22-1 p. 6; DE 27-1 p. 6; DE 27-32 p. 6 (71); DE 27-29 pp. 3-4 (19-20).) Bellant told Spurling that he and Claussen would review and forward it to corporate. (DE 22-1 p. 6: DE 27-1 p. 6; DE 27-29 p. 4 (20).) Bellant did not speak with Spurling regarding her medical examination nor did he inquire about the "in progress" medical work up.  (DE 46 p.9; DE 27-29 p. 4 (20-21).) Spurling asserts that Bellant indicated that C&M personnel would have an interactive meeting with Spurling on April 26 to discuss her requests for reasonable accommodations, but no interactive meeting occurred. (DE 22-1 p. 6; DE 27-1 p. 6; DE 27-32 p. 6 (71-72); DE 27-17 pp. 10-11.) Claussen testified that he and Bellant reviewed the physician's concerns in the context of making a recommendation to be sent to C&M corporate human resources. (DE 22-1 p. 6; DE 27-1 p. 6; DE 27-30 p. 4 (16-17).)

Bellant testified that the notation from Dr. Beitzel indicating that Spurling suffered from a condition covered by the ADA was not sufficient for C&M. (DE 22-1 p. 6; DE 27-1 p. 6; DE 27-29 p. 5 (27); DE 27-3.) Likewise, Swoyer

9

asserted,"I don't believe that the doctor is in a position to make that determination. It is his opinion." (DE 22-1 p. 6; DE 27-1 p. 6; DE 27-31 p. 4 (9-10).) Swoyer further testified that Dr. Beitzel's assessment that Spurling was suffering from a disability covered by the ADA, might not even constitute an impairment. (DE 22-1 p. 6; DE 27-1 p. 6; DE 27-31 p.9 (28).) Bellant and Swoyer did not ask for any further clarification of the doctor's statement although Swoyer testified that he had asked for additional information from a doctor "many times" in other disability cases. (DE 22-1 p. 6; DE 27-1 p. 6; DE 27-29 pp. 5-6 (27-29); DE 27-31 p. 7 (20).) Dr. Beitzel testified that he would have been happy to discuss Spurling's condition with C&M, but he was never contacted. (DE 46 p. 9-10; DE 29-1 p. 3 ¶ 16.) Because Dr. Beitzel believed that Spurling was suffering from a severe sleep apnea or other medical or sleep related problem, he referred Spurling to a sleep disorder specialist and, additionally, would have authorized a medical leave pursuant to the FMLA for Spurling to complete her testing.  (DE 46 p. 9; DE 29-1 pp. 1-3 ¶¶ 8-16.)

   On April 23, 2010, Bellant again contacted Swoyer by email within the thread of emails previously begun on April 16, 2010. (DE 22-1 p. 7; DE 27-1 p. 7; DE 27-21; DE 27-22.) The April 23, 2010 email included an attachment of the scanned C&M paperwork that Spurling had returned to Bellant on April 21, 2010. (DE 22-1 p. 7; DE 27-1 p. 7; DE 27-22; DE 27-29 pp. 5-6 (27-28); DE 27-31 p. 4 (8-9).) Bellant's email requests input from Swoyer regarding

10

obtaining a legal opinion based on Spurling's C&M medical documents. (DE 22-1 p. 7; DE 27-1 p. 7; DE 27-22.)

Claussen testified that while the company has reviewed "several different potential disabilities and accommodations for those," he did not recall ever making any accommodations. (DE 22-1 p. 7; DE 27-1 p. 7; DE 27-30 p. 2 (7).) In Spurling's case, C&M management continued to confer with each other and corporate counsel through a series of emails and conference calls. (DE 22-1 p. 7; DE 27-1 p. 7; DE 27-23 thru DE 27-25; DE 27-29 p. 8 (44-46); DE 27-31 pp. 7-8 (21-13.).) On April 27, Swoyer asked Bellant, "What is your recommendation? How would you like to proceed?" (*Id.*; DE 29 p. 2; DE 46 pp. 6-7; DE 27-23.) Bellant indicated that he and Claussen would review C&M's corporate counsel's recommendations, and on April 28, 2010, Bellant made their recommendations to Swoyer:

> I have met with Darrin and Kurt and we recommend the aggressive approach. Upon review of all the facts presented we feel that we did the interactive process during the progressive disciplinary process of asking if she had a medical condition to which she told us no. We even suggested if moving to a different shift would solve [Spurling's sleep issues] to which she stated she did not want to go to a different shift. While there is an element of risk as Tom outlined, we feel we did everything during the discipline process.
>
> We do not see the conservative approach changing the situation and the recommendations from the doctor of additional breaks (she already gets two ten minute breaks and a half hour lunch) or food on the line, are not reasonable.

(DE 22-1 p. 7; DE 27-1 p. 7; DE 27-25.)

11

Spurling's Termination Notice is dated April 28, 2010, and Bellant testified that he called Spurling by phone that day to inform her of her termination. (DE 22-1 p. 8; DE 27-1 p. 8; DE 27-15; DE 27-29 p. 7(37).) Spurling's medical insurance was provided by C&M, and it was lost when Spurling was terminated. (DE 22-1 p. 8; DE 27-1 p. 8; DE 27-17 pp. 16-17 (Rog 7).) Spurling was eventually able to complete her medical testing and was definitively diagnosed with narcolepsy by Dr. Sekar on May 27, 2010, only one month after her termination. (DE 22-1 p. 8; DE 27-1 p. 8; DE 27-18.) Spurling's narcolepsy is well controlled with medication. ( DE 22-1 p. 8; DE 27-1 p. 8; DE 27-32 pp. 7-8 (76-77); DE 29-1 p. 3 ¶ 19.)

## V.     <u>SUMMARY OF THE ARGUMENT</u>

Summary judgment is not appropriate in this case because a reasonable jury could find that Spurling suffered from a disability, was perceived and regarded as disabled, had a record of disability and was denied reasonable accommodations and the interactive process pursuant to the ADAAA. This case ultimately turns on what C&M knew about Spurling's disability when the actual decision to terminate Spurling was made. It is Spurling's contention that the trial court erred when it ignored the unequivocal notice test and found that Spurling's termination occurred when an ignored April 16, 2010 email recommendation was sent twelve days prior to Spurling's actual verbal and

written termination date of April 28, 2010. The trial court also erred when it found that C&M was entirely unaware of Spurling's disability when the decision to terminate was made and disregarded evidence in Spurling's favor -- characterized by the trial court as a "rote conclusion" and "cursory note" - - from Spurling's physician that she was suffering from a disability that warranted protection under the ADAAA.

In its denial of summary judgment Opinion and Order, the trial court made no finding as to whether Spurling was disabled, reasoning, "Because C&M's decision to terminate Spurling was made before it learned of her narcolepsy, Spurling is unable to prove that she was fired "because of" her disability. So I need not decide whether Spurling was in fact disabled or was otherwise qualified to perform her job." (DE 57 p. 22.) Likewise, the trial court reasoned in its Opinion and Order denying the motion to amend the judgment, "Because I remain convinced that an employer cannot discriminate against someone for a disability that both the employer and the employee are unaware of, the motion to amend the judgment is **DENIED**." (*Id.* p. 32.)

To reach these findings, the trial court improperly drew all reasonable inferences in favor of C&M, not Spurling. By finding that the ignored recommendation to terminate Spurling made on April 16, 2010 is controlling, the trial court essentially discounted and negated the volumes of evidence concerning activity between Bellant (local HR), Spurling, Dr. Beitzel, Swoyer

13

(corporate HR), C&M's corporate counsel and Claussen (plant manager), which all take place after April 16 and before Spurling was actually terminated on April 28, 2010.

The trial court further erred when it found that Spurling was not entitled to the interactive process to determine reasonable accommodations, and that C&M did not interfere with Spurling's right to a leave of absence pursuant to the FMLA to finish her medical testing. This court should, therefore, reverse the trial court's grant of summary judgment to C&M on Spurling's ADAAA and FMLA claims because a reasonable trier of fact could review the evidence and determine that Spurling timely notified C&M of her disability and her need for medical leave.

## VI.     ARGUMENT

### A.     INTRODUCTION

Spurling contends that the trial court erred when it ignored the unequivocal notice test, which establishes Spurling's termination date as April 28, erroneously finding: (1) the *decision* to terminate Spurling was well underway on April 16, so (2) C&M had no notice of Spurling's serious medical condition.  That finding negates and ignores C&M's copious documents regarding Spurling's developing medical issues, Bellant's April 16 assistance in providing Spurling with the proper forms to take to her physician, the April 16

through April 27 review of the physician's findings by C&M's corporate

management and counsel, C&M's April 28 email claiming that it provided

Spurling with interactive process during Spurling's April 15 suspension

meeting and C&M's interference with Spurling's leave of absence to complete

her medical testing pursuant to the FMLA. The trial court's findings must be

reversed on every issue.

**B.     STANDARD OF REVIEW**

Spurling appeals the grants of summary judgment and denial of her Federal

Rule of Civil Procedure 59(e) motion to alter or amend judgment on both her

ADAAA disability claim, including the failure of the interactive process to find a

reasonable accommodation, and her FMLA interference claim.

**1.     <u>Summary Judgment</u>**

A grant of summary judgment is subject to *de novo* review with all

reasonable inferences, and evidence review, drawn in the light most favorable

to Spurling. *Pagen v. Tin Inc.*, 695 F.3d 622, 624 (7th Cir. 2012); *Powers v. USF

Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011). This standard is applied with

added rigor in employment discrimination cases where intent and credibility

are critical issues and direct evidence is seldom available. *Seener v.

Northcentral Tech. Coll.,* 113 F.3d 750, 757 (7th Cir. 1997).

**2.     <u>Motion to Alter/Amend Judgment</u>**

Spurling's ADAAA and FMLA claims as argued in her motion to alter or

amend a judgment are reviewed under an abuse of discretion standard. *El-Gazawy v. Holder*, 690 F.3d 852, 857; *Muratoski v. Holder*, 622 F.3d 824, 830 (7th Cir. 2010).

## C.    THE TRIAL COURT ERRED WHEN IT FAILED TO ACKNOWLEDGE THE UNEQUIVOCAL NOTICE TEST

### 1.    Spurling's Date of Termination Is April 28, 2010 per the Unequivocal Notice Test

Spurling contends that the trial court erred when it ignored Spurling's argument regarding the unequivocal notice test and found that Bellant's first termination recommendation to Swoyer on April 16, 2010 is controlling as Spurling's date of termination. (DE 27 pp. 2-3; DE 27-15; DE 46 pp. 4-8; DE 57 pp. 22-23, 41.) This finding was reached when the trial court improperly construed early evidence in favor of C&M and ignored evidence of later activity when Spurling was permitted by C&M to return her physician's documents, which notified C&M that Spurling was suffering from a disability that merited the protections of the ADA. The many critical events that took place between April 16 and Spurling's actual verbal and written termination date of April 28, 2010 were rendered moot by the trial court's error.

This appellate court has found that the date of termination is fixed by satisfaction of the two prongs of the "unequivocal notice of termination" test. *Dvorak v. Mostardi Platt Assocs., Inc.,* 289 F.3d 479, 486 (7th Cir. 2002)(citing

16

*Mull v. ARCO Durethene Plastics, Inc.,* 784 F.2d 284, 288 (7th Cir. 1986)). There must first be a final decision to terminate and then the employer must provide unequivocal notice of its final decision to the employee. *Flannery v. Recording Indus. Ass'n of Am.,* 354 F.3d 632, 637-38 (7th Cir. 2001)(citing *Dvorak*, 289 F.3d at 486).  Both elements must be fulfilled to fix the date of termination. *Id.* Because Spurling was not notified of her termination until April 28, 2010, after extensive review by C&M through its corporate chain up to and including its corporate counsel, Bellant's first ignored recommendation for termination on April 16 is irrelevant and should not have been considered by the trial court as controlling. (DE 27 pp. 2-3; DE 57 pp. 22-23.)

The import given to Bellant's recommendation has been addressed in Seventh Circuit case law, which notes the distinction between making decisions and making recommendations in the employment context. *Lever v. Northwestern Univ.,* 979 F.2d 552, 554 (7th Cir. 1992). In *Lever*, the court characterized a "decision" as a "concrete act [that] smacks of finality." *Id.* Further, a decision or recommendation is dependent upon the power of the individual making the determination; only someone with the authority to choose a particular outcome can make the decision. *Id.*

It is undisputed that Bellant lacked the power to terminate and only communicated his recommendation up the chain of command to Swoyer, via email, on April 16. (DE 27-20; DE 27-21.) Swoyer's email response did not

17

chastise Bellant for taking Spurling's call on April 16 and preparing ADAAA paperwork, nor did it indicate to Bellant that Spurling's call was for naught and that termination proceedings were underway. Not only did Swoyer fail to approve Bellant's recommendation, he effectively ignored it, commenting on the fact that Spurling appeared to be asking for the protection of the ADA or FMLA - - two legal obligations that Swoyer was tacitly admitting were appropriate. (DE 27 p.3; DE 46 p. 5; DE 27-21.) Swoyer further noted that guidance from corporate counsel might be necessary. (*Id.*)

The email record is strong that no termination decisions were made until Dr. Beitzel's completed paperwork had been reviewed and commented on by C&M's corporate counsel.  Contrary to the trial court's reasoning, Spurling was not told that it was "too little too late," or that she was terminated on April 16 when she telephoned Bellant to tell him that she believed something medical was wrong and that she was going to see her physician. (DE 57 p. 27.) Spurling was not told that she had already been terminated when she met with Bellant later on April 16 to pick up the paperwork for Dr. Beitzel. Spurling was not told that she was already terminated on April 21 when she returned Dr. Beitzel's completed paperwork to Bellant.

After a thorough review of Dr. Beitzel's paperwork by local, corporate management and its counsel, corporate counsel's recommendations to local C&M management were not discussed until April 27. At that time Swoyer, via

email, asked Bellant, "What is your recommendation? How would you like to proceed?" (DE 27 p. 4; DE 27-23; DE 29 p. 2; DE 46 pp. 6-7.) Swoyer's question makes good sense considering that by April 27 --12 days after Spurling's April 15 suspension meeting and six days after Spurling returned Dr. Beitzel's paperwork -- C&M had been notified by Spurling's physician that she was suffering from a disability protected by the ADAAA.

Bellant did not reply to Swoyer's question until April 28 when Bellant indicated that he and the plant manager had decided to "recommend the aggressive approach" despite the "element of risk as [corporate counsel] outlined." (DE 27 p. 4; DE 27-25; DE 46 pp. 6-7.) It was only after Bellant was asked how he would like to proceed and he responded on April 28 with the "aggressive approach," that Spurling received a phone call telling her that she was terminated. Likewise, Spurling's termination paperwork is dated April 28, 2010. (DE 27-15.)

### 2.    Spurling's Termination Date per *Bultemeyer*

Surprisingly, Spurling's argument regarding the unequivocal notice test issue and her verbal and written April 28, 2010 termination date were completely overlooked and never addressed in any way by the trial court in its summary judgment order. (DE 57 p. 22-23, 27.) Spurling did not, however, put all of her eggs in the unequivocal notice basket. Spurling additionally argued that even if the trial court rejected the unequivocal notice test, case law still required that

C&M consider Spurling's request for medical testing on April 16, 2010 per *Bultemeyer v. Fort Wayne Comm. Schools*, 100 F.3d 1281 (7th Cir. 1995). (DE 27 p. 4; DE 46 p. 2.)

In *Bultemeyer*, this court faulted the defendant, Fort Wayne Community Schools ("FWCS"), for failing to engage in the interactive process and terminating Bultemeyer when he presented a note from his physician on the day that he was terminated. *Bultemeyer*, 100 F.3d at 1286. The court reasoned, "Even though the letter came after FWCS decided to fire him, FWCS could have used the opportunity it presented to reconsider the decision to terminate his employment and include Bultemeyer and Dr. Fawver in the discussions.  That would have been the proper way to engage in the interactive process." *Id.*

Like *Bultemeyer*, even though the first ignored recommendation to terminate Spurling was made on April 16 - - the same day that Spurling notified Bellant that a medical condition might be causing her symptoms - - when Spurling returned Dr. Beitzel's paperwork to C&M on April 21there was plenty of time for C&M to engage in the interactive process with Spurling and Dr. Beitzel regarding Spurling's disability, continued medical testing and the need for accommodation. *Id.* Although Swoyer testified that he had spoken with physicians on several occasions regarding other employees, neither he nor Bellant made any effort to speak with Dr. Beitzel or Spurling regarding her medical issues.

20

For the foregoing reasons including the unequivocal notice test and a review of the Spurling time line under the guidance of *Bultemeyer*, this court should reverse the trial court and find that Spurling's termination date is April 28, and all activity that occurred up to April 28 is relevant and should be construed in Spurling's favor.

**D.    THE TRIAL COURT ERRED WHEN IT FOUND THAT IT DID NOT NEED TO MAKE A DETERMINATION AS TO WHETHER SPURLING WAS DISABLED, REGARDED AS OR HAD A RECORD OF DISABILITY**

Extensive changes have occurred to the ADA through the ADA Amendments Act of 2008 ("ADAAA"), which became effective January 1, 2009. *Servatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 n.1 (7th Cir. 2010); (DE 27 pp. 10-25.) The ADAAA expands discrimination prohibitions against a qualified individual on the basis of the individual's disability. 42 U.S.C. § 12112(a). Spurling may establish a viable ADAAA claim by a showing that (1) she is disabled; (2) she is qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) she has suffered an adverse employment action because of the disability. *Dvorak,* 289 F.3d at 483.

**1.    Actual Disability Does Not Require a Final Diagnosis**

Spurling contends that the trial court erred when it reasoned,"Because C&M's decision to terminate Spurling was made before it learned of her narcolepsy, Spurling is unable to prove that she was fired "because of" her

21

disability. So I need not decide whether Spurling was in fact disabled or was otherwise qualified to perform her job." (DE 57 p. 22.) To reach this conclusion, the trial court ignored the unequivocal notice test, *supra*, and all activities that occurred after Bellant made his first ignored recommendation to Swoyer on April 16, 2010. The trial court was indifferent to the fact that Bellant *assisted* Spurling with her efforts to meet with Dr. Beitzel by providing Spurling with a letter explaining the interactive process and reasonable accommodation and a C&M generated form for the physician to complete. (DE 27-2; DE 27-3.)  After Bellant placed Spurling on a leave of absence, Spurling took the C&M paperwork to Dr. Beitzel on April 21, 2010 and returned the completed form to Bellant the same day. (DE 27-3; DE 27-20.) Dr. Beitzel noted that Spurling was suffering from a disability covered under the ADA, and indicated that additional medical testing was in progress. Admittedly, C&M's form did not ask for, nor did Dr. Beitzel provide, a definitive diagnosis. (DE 27-3 p. 2.)

   Case law requires an employer to have knowledge of the existence of a disability, but is silent as to whether a diagnosis is required. *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 931 (7th Cir. 1995)(holding under the ADA as it existed prior to the ADAAA).  While not controlling, other courts have rejected the diagnosis requirement, as well. *Hammon v. DHL Airways, Inc.,* 980 F.Supp. 919, 926 (S.D. Ohio 1997)(finding that "[t]he employer need only know the underlying facts of the condition," not the diagnosis); *accord, Schmidt*

*v. Safeway Inc.,* 864 F.Supp. 991, 997 (D. Or. 1994). (DE 27 p. 11; DE 22 pp. 5-6.) Per the relevant, cited case law, this court should construe all facts in Spurling's favor, reverse the trial court and find that Spurling was not required to have an "official diagnosis" to claim the protections of the ADAAA.

### 2.    C&M Had Knowledge of Spurling's Disability

The trial court relied on and referenced several cases that it reasoned were similar to Spurling's fact pattern. (DE 57 pp. 22-26.) A favorable citation was made by the trial court to *Hedberg*, 47 F.3d at 931, for the proposition that C&M had no knowledge of Spurling's disability, thus defeating liability pursuant to the ADAAA. (DE 57 p. 22.) The events leading to discharge in *Hedberg*, however, are dissimilar to Spurling's, and Spurling contends that the trial court's reliance on the case was improper. (DE 46 p. 13.)

Hedberg, lacking in interpersonal skills and work ethic, was one of ten selected for termination by eight department heads during a reduction in workforce ("RIF") meeting. *Hedberg*, 47 F.3d at 930. The department heads were unaware that Hedberg had been undergoing medical testing for fatigue, which turned out to be a potentially fatal disease. *Id.* Pund, Hedberg's direct supervisor, knew of the testing but had been sworn to secrecy. Upholding the secrecy vow, Pund did not tell anyone of the testing until well after the decision to RIF Hedberg was made. *Id.* The lower court's decision granting summary judgment to Indiana Bell was upheld because the evidence established that the

23

decision to RIF Hedberg was made without knowledge of his disability. *Id.* at 932.

Unlike Hedberg, C&M had knowledge of Spurling's struggles with sleep issues from sources including coworkers, managers and HR. Unlike Hedberg, the final decision to terminate Spurling came *after* Spurling provided C&M with documentation from Dr. Beitzel indicating that her disability was protected by the ADAAA, and without a proper interactive process to determine a workable reasonable accommodation. Unlike Hedberg, after Spurling provided C&M with Dr. Beitzel's completed form, the discussion of whether to terminate Spurling was reviewed at every level: local HR and plant manager up the corporate chain through corporate counsel. This review took more than a week before the April 28 decision to "take the aggressive approach" despite the risks was finally agreed to by Bellant, Claussen and Swoyer. (DE 46 pg. 13; DE 22-24; DE 22-25.)

*Adkins v. Briggs & Stratton,* 159 F.3d 306 (7th Cir. 1998) was another case improperly relied on by the trial court for the flawed proposition that C&M lacked knowledge of Spurling's disability, because Spurling did not receive a definitive diagnosis until after she was terminated. (DE 57 p. 23; DE 46 p.14.) In *Adkins*, the plaintiff was terminated for repeatedly falling asleep on his forklift. *Adkins*, 159 F.3d at 307. The case was dismissed by the district court when Adkins admitted that he did not receive his narcolepsy diagnosis until

four months after he was fired. *Id.* Unlike the facts of Spurling's case, the

*Adkins* opinion merely states that the plaintiff was asleep on his forklift and is

silent as to any other information regarding workplace demeanor or if any other

episodes occurred. (*Id.*) Unlike *Adkins*, Spurling's record reflects ample

evidence as to Spurling's on-going struggle with wakefulness illustrated

through Spurling's discipline record and coworker statements.  Further, unlike

*Adkins*, Spurling plead and argued that she was denied the interactive process

and reasonable accommodation in violation of the ADAAA.

Spurling contends that the trial court also erred when it erroneously found

that *Kolivas v. Credit Agricole*, 1996 WL 684167, *3 (S.D.N.Y. Nov. 26, 1996),

*aff'd*, 125 F.3d 844 (2nd Cir. 1997), presented an analogous fact pattern to

Spurling's. (DE 57 p. 23; DE 46 pp. 14-15.) In *Kolivas,* the plaintiff was highly

insubordinate to his superior, Zollo. *Kolivas*, 1996 WL 684167 at *1. Kolivas

continued his insubordination by reporting Zollo to the company president,

Chauvel, calling Zollo's actions "stupid" and claiming that Zollo was threatened

by Kolivas' superior work. *Id.* Chauvel considered firing Kolivas for his

outrageous criticisms of Zollo. *Id.* On February 10, Zollo indicated to HR that

she wanted Kolivas' employment terminated. *Id.* *2. On February 13, although

Kolivas told HR that he was suffering from depression, he turned in a doctor's

note that failed to indicate the nature of Kolivas' medical condition or state that

Kolivas suffered from a disability. *Id.* After HR received approval from Chauvel,

Kolivas was terminated the following day. *Id.*

The *Kolivas* case, which is not controlling on this or the trial court, is inapplicable to the facts of Spurling's case. (DE 46 pp. 14-16.) Unlike Kolivas, Spurling had no major performance issues not related to her sleepiness and no insubordinate occurrences with C&M management.  Unlike Kolivas, many C&M management employees and coworkers knew that Spurling was struggling with wakefulness issues that she, herself, did not recognize.  Unlike Kolivas, Spurling was encouraged by Bellant on April 15 to provide "any information that could affect C&M's decision" prior to C&M rendering its final decision on the following Monday. (DE 27-14, bullet pt. 9.) Unlike Kolivas, Spurling provided timely documentation - - with Bellant's assistance and blessing, on C&M's own forms - - from her physician, Dr. Beitzel, stating that Spurling was suffering from a "disability" meriting the protections of the ADAAA. Unlike Kolivas, after Dr. Beitzel's paperwork was given to C&M, Spurling should have received the benefit of the interactive process to determine if a good reasonable accommodation could be made based on the new medical information, or to decide if she should be placed on an FMLA leave to finish her testing. Unlike Kolivas, there is no evidence that can or should have been construed in C&M's favor to establish that C&M ever considered or began to act on Bellant's first, ignored recommendation to terminate Spurling on April 16 - - the emails of April 27 and April 28 asking Bellant for his

"recommendation" of how he would like to proceed directly contradict such a finding. (DE 27-24; DE 27-25.)

    For the foregoing reasons, Spurling requests this court to reverse the trial court and find that C&M had ample knowledge of Spurling's disability, officially named or not, and that Spurling's disability merits the protections of the ADAAA as Dr. Beitzel asserted.

### 3.    Spurling Is Substantially Limited in One or More Major Life Activities

    The ADAAA has broadened the scope of protection and expanded the definitions of "major life activities," which now include:

> (I) Caring for oneself, performing manual tasks, *seeing, hearing,* eating sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, *concentrating, thinking, communicating, interacting with others, and working;* and

> (ii) The operation of major bodily function, including functions of the immune system...*neurological, brain,* respiratory, circulatory, cardiovascular...The operation of a major bodily function includes the operation of an individual organ within a body system.

29 C.F.R. § 1630.2(i)(1)(i)(ii)(emphasis added).

    The ADAAA additionally clarifies that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id.* § 1630.2(j)(1)(vii). Thus, the ADAAA "make[s] it easier for a plaintiff with an episodic condition...to establish that he is an 'individual with a disability.'" *Carmona v. Southwest Airlines Co.,* 604 F.3d 848, 855 (5th Cir. 2010)(citation omitted). Spurling's narcolepsy meets the standard of

27

substantially limiting one or more major life activities, which "is not meant to be a demanding standard." 29 C.F.R. § 1630.2 (j)(1)(i).

Spurling testified regarding her limited brain and neurological function:

Q. When you had a sleeping episode...how [did] it affect[ ] you?

A. I couldn't, I couldn't see, hear or walk or concentrate or know that I was sleeping. So I didn't realize I was.

. . .

...

A. They were saying I was falling asleep, but I wasn't aware I was falling asleep...I didn't realize I was...my eyes was [sic] open, and I was still packing...and I wasn't aware that I was falling asleep.

(DE 27 p. 13; DE 27-32 p. 7 (75-76).) Per Spurling's unrefuted testimony, her narcolepsy affects Spurling's neurological and cognitive functions in life and work. Spurling's impairment impacts her ability to see, hear, think, work, concentrate and communicate with others at work and in her private life.

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200-01, 122 S.Ct. 681, 693, 151 L.Ed.2d 615 (2002)(holding that the central inquiry is whether the plaintiff is unable to perform tasks central to her daily life, not just whether she is unable to perform job-related tasks). Contrary to the trial court's findings, or lack of finding, a reasonable juror could view this evidence in Spurling's favor and find that Spurling is substantially limited in one or more major life activities.

### 4. <u>Spurling Has a Record Of Disability</u>

According to ADAAA regulations, an individual may establish a record of

disability through many types of documents, including medical or employment records. 29 C.F.R. § 1630.2 (k) appendix. The "record of" prong of the ADAAA is closely related to the "actual disability" prong especially for episodic conditions "if the impairment would be substantially limiting when active." *Id.*; 42 U.S.C. § 12102(4)(D).

Spurling began to satisfy the "record of disability" prong as early as February 25, 2010 when she provided a note from her physician that stated, "pt was recently asked to discontinue medicine related to her passing out @ work 2/15/10 & 2/16/10." (DE 27 p. 14; DE 27-19.) Further, the contents of Dr. Beitzel's completed C&M paperwork, returned by Spurling on April 21, indicate that Spurling had a disability covered under the ADAAA.  (DE 27 p. 14; DE 27-3 p. 2.) C&M had additional records of Spurling's impairment as documented through coworker and supervisor statements.  (DE 27-3; DE 27-5 thru DE 27-12; DE 27-14; DE 27-19; DE 27-27.) These written records indicate that Spurling was substantially limited in cognitive function necessary for life and work: seeing, hearing, concentrating, thinking, communicating, and interacting with coworkers. *Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005)(finding no disability when records of activity after surgery showed ability to function as necessary for the job).

Despite C&M's claim that Dr. Beitzel's mere "opinion" regarding the ADA was insufficient for its analysis of Spurling's condition, C&M never requested a

diagnosis nor sought any additional medical information from Spurling or Dr.

Beitzel, although Swoyer testified that he had done so in other cases. (DE 27

p. 15; DE 27-31 p. 4 (9-10), p. 7 (20); DE 27-29 pp. 5-6 (27-29); DE 46 p. 9.)

As argued, C&M's knowledge of Spurling's consciousness issues, documented

through its own employment records including Spurling's February 2010

return to work note, coworker and management statements regarding

Spurling's wakefulness struggles and fears for her safety, coupled with Dr.

Beitzel's paperwork, are far too much to overlook. (DE 27-3; DE 27-5 thru DE

27-12; DE 27-14; DE 27-19; DE 27-27.) A reasonable juror could find that

Spurling presented sufficient evidence to establish that she is disabled

pursuant to the "record of disability" prong, and the trial court must be

reversed on this issue.


### 5.   <u>**Spurling Was Regarded As Disabled**</u>

The ADAAA prohibits discrimination by an employer regarding its employee

as disabled. The employer must believe, whether correctly or not, that the

employee has an impairment which substantially limits her in one or more

major life activities. *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir.

2005); *Cigan v. Chippewa Falls Sch. Dist.,* 388 F.3d 331, 335 (7th Cir. 2004).

The Appendix to 29 C.F.R. § 1630.2(1) gives an instructive example of employer

belief:

> Thus, for example, an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled.

29 C.F.R. § 1630.2(1) app., 76 Fed. Reg.16978, 17015 (Mar. 25, 2011).

C&M's belief that Spurling's medically-related incidents of loss of consciousness were a serious safety concern mirrors the Appendix example and is documented on multiple occasions through statements by coworkers and management personnel. (DE 27 pp. 15-16; DE 27-10; DE 27-12; DE 27-13; DE 27-27.) Spurling's impairment was, thus, documented long before her final written warning of April 15, 2010, and it was firmly established on April 21, 2010 when Spurling returned Dr. Beitzel's completed paperwork to Bellant. (DE 27-3.) Further, it was Bellant who asked Spurling during her April 15 suspension meeting if she had a medical condition that might be causing her problems, and it was Bellant who told Spurling to contact him with any information that might sway C&M's decision.

After receiving Dr. Beitzel's paperwork, which validated Bellant's suspicions, C&M dropped the ball. A reasonable trier of fact could review this evidence and conclude that C&M regarded Spurling as disabled when it made the decision to terminate her after it received confirming information from her physician. C&M should not be permitted to bury its head in the sand, fail to investigate further or dismiss the doctor's findings as mere "opinion" in order to avoid its ADAAA

31

obligations. (DE 27 p. 16.)

While the ADAAA has amended the "regarded as" analysis, it has also clarified that there is no entitlement to a reasonable accommodation for an individual who is regarded as disabled.  29 C.F.R. § 1630.2 (1); 42 U.S.C. § 12201(h). Spurling acknowledges that as long as she continues with her medication, she needs no accommodation to perform her job.

When reviewing the evidence, a reasonable juror could find that Spurling was regarded as disabled by C&M when it turned a blind eye to Dr. Beitzel's notice of disability protection.  The same juror could find that Spurling was ultimately terminated for that reason. For the foregoing reasons, this court should reverse the trial court and find that due to C&M's copious documents regarding Spurling's lack of consciousness issues, and its intentional failure to work with Spurling following receipt of Dr. Beitzel's paperwork despite the "risk," C&M regarded Spurling as disabled.

## 6.   **Spurling Was Qualified to Perform Her Job**

Pursuant to the ADAAA, Spurling is qualified to perform her job if she has the skill, experience, education and other requirements needed for the job, and could perform its essential functions either with or without a reasonable accommodation. 42 U.S.C. § 12111(8); 42 U.S.C. § 12112(a). Spurling began working as a packer/inspector for C&M beginning in February 2004, and she remained in this position, with few problems not associated with her

32

narcolepsy, for the duration of her employment. (DE 27 pp. 16-17.) Spurling

contends that when it made its finding that C&M's termination of Spurling was

non discriminatory, the trial court improperly drew inferences in favor of C&M

regarding Spurling's performance issues as they related to her disability. (DE

57 p.26.) Citing *Hedberg*, the court opined:

> [E]mployers frequently fire people based on how they perform, and
> "[a]llowing liability when an employer indisputably had no knowledge of
> the disability, but knew of the disabilities effects, far removed from the
> disability itself and with no obvious link to the disability, would create an
> enormous sphere of potential liability."

(*Id.*); Hedberg, 47 F.3d at 934.

Per *Hedberg*, to find that C&M *indisputably had no knowledge* of Spurling's

disability, the trial court again ignored the unequivocal notice test, the lengthy

string of events that transpired after Bellant's first recommendation to

terminate was ignored by Swoyer and Spurling's return of Dr. Beitzel's

paperwork - - which undeniably put C&M on notice that Spurling was suffering

from a disability protected under the ADAAA. (*Id.*; DE 57 pp. 39-40.) The trial

court further improperly drew inferences in favor of C&M when it reasoned that

Spurling's problems were caused by her "graveyard" shift schedule. (DE 57 p.

26.) A reasonable trier of fact could just as easily review Spurling's coworker

statements regarding her condition, combined with Bellant's notes of Spurling's

April 15 suspension meeting, and conclude that Spurling's issues were far

more serious than merely falling asleep due to the graveyard shift.  In his

33

suspension meeting notes, bullet point number 2, Bellant noted:

> When given the details of the incident, she had no recollection of falling asleep or nodding out even though she was told that both the employee and her supervisor yelled at her to get her attention.

(DE 27-14.)

A reasonable trier of fact could also conclude from Bellant's suspension notes that the questions to Spurling concerning her medical condition, coupled with her non recollection of what was happening and Bellant's parting admonition to contact him with any information that might help C&M make a decision, actually explain why Bellant assisted Spurling with her quest to see her physician on April 16. It also explains why Bellant did not tell Spurling that she was terminated on April 16 when she called regarding the need to see her physician, nor did he tell Spurling that she was terminated on April 21 when she returned Dr. Beitzel's completed paperwork. Instead, according to Spurling, Bellant promised to meet with her to discuss a reasonable accommodation. (*Id.*; DE 27-13; DE 27-32 p. 6 (71-72); DE 27-17 pp. 10-11.)

Additionally, C&M should be foreclosed from arguing that Spurling lacked the requisite skill and experience to perform the essential functions of her position per the *Bultemeyer* decision. *Bultemeyer*, 100 F.3d at 1284 (noting, "The parties do not dispute that Bultemeyer satisfies the prerequisites for the position; indeed, FWCS, having employed Bultemeyer as a custodian for many years, cannot dispute that"). Likewise, C&M cannot rationally argue that

Spurling lacked the prerequisites to perform her position as she had worked for

C&M for approximately six years until the symptoms of her narcolepsy

interfered with her job performance. (DE 27 p. 18.)

Spurling's condition is well controlled with medication and she no longer

loses consciousness involuntarily.  Accordingly, Spurling was and is qualified

to perform the essential functions of her position with no permanent

accommodations. (DE 27 pp. 17-18; DE 27-32 pp. 7-8 (76-77); DE 27-18.) This

court must, therefore, reverse the trial court on this issue and find that

Spurling is qualified to perform her job duties.

### 7. <u>Spurling's Termination Was an Adverse Employment Action</u>

Spurling must establish that she suffered an adverse employment action

because of her disability. *EEOC v. Lee's Log Cabin*, 546 F.3d 438, 442 (7th Cir.

2008). C&M management decided to proceed with termination, "the aggressive

approach," on April 28, seven days after Spurling turned in Dr. Beitzel's

statement of an ADAAA protected disability, but noting, "...there is an element

of risk..." (DE 27 p. 18; DE 27-25.) In the termination notice, C&M indicates

that it terminated Spurling for safety issues related to her loss of

consciousness, which is a symptom of her narcolepsy. (DE 27-15.) Termination

for these concerns is sufficient to demonstrate that C&M acted "because of"

Spurling's disability. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir.

2003). Accordingly, C&M's action in terminating Spurling "because of"

Spurling's narcolepsy symptoms is sufficient to establish that Spurling suffered an adverse employment action.

Based on Spurling's arguments and evidence, a reasonable trier of fact could find that Spurling has presented sufficient evidence to establish her ADAAA discrimination case on the basis of her disability, record of disability and C&M's perception of her disability. Spurling has, thus, fulfilled all three prongs required for an ADAAA claim by proving: she is disabled, she is qualified and she suffered an adverse employment action. *Dvorak,* 289 F.3d at 483. For all of the foregoing reasons, Spurling respectfully requests this court to reverse the trial court's findings on Spurling's disability discrimination claim.

## E. THE TRIAL COURT ERRED WHEN IT FOUND THAT SPURLING WAS NOT ENTITLED TO THE INTERACTIVE PROCESS TO DETERMINE A REASONABLE ACCOMMODATION

### 1. C&M Failed to Offer Reasonable Accommodations

The ADAAA prohibits discrimination based on the need for reasonable accommodations. 42 U.S.C. § 12112(5); *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1066 (7th Cir. 2008). In addition to establishing qualification under the "actual disability" or "record of" prongs, Spurling must show that C&M was aware of her disability and that she requested accommodations, which C&M failed to provide. *EEOC v. Sears Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005); 29 C.F.R. § 1630.9(e).

36

Spurling argued denial of reasonable accommodations in her motion for summary judgment, response to defendant's motion for summary judgment and in her motion to alter/amend judgment. (DE 22 pp. 11-12; DE 27 pp. 19-20; DE 46 pp. 8-12.) In the summary judgment Opinion and Order, the trial court made no substantive finding regarding this issue, basically continuing with its flawed reasoning that Spurling was terminated before C&M had notice of her disability. (DE 57 p. 24.) Spurling contends that the trial court was in error when it opined, "The process to terminate Spurling was well underway by the time that she informed C&M that she might have a disability and was under a doctor's care." (*Id.*)

Spurling contends that when the trial court did address the reasonable accommodation and interactive process claims in its denial of Spurling's motion to amend/alter judgment, it was in error. (DE 57 p. 42.) The trial court dismissed Spurling's citation to *Bultemeyer*, because "...Bultemeyer makes clear that the threshold inquiry in a reasonable accommodation case is whether the employer was *aware of the disability*." *Bultemeyer*, 100 F.3d at 1284. (DE 57 p. 42.) Contrary to the trial court's reasoning, there was ample evidence of C&M's knowledge of Spurling's medical condition, as outlined *supra*.

Spurling requested reasonable accommodations from C&M on two occasions prior to her actual diagnosis of narcolepsy and its resulting successful

37

treatment. The first request was made verbally on April 16, 2010 when Spurling requested time to obtain a medical diagnosis and/or treatment for her continued loss of consciousness. (DE 27 p. 19; DE 27-32 pp. 3-4 (56-57).) The second request occurred indirectly on April 21 when Spurling turned in Dr. Beitzel's paperwork, which listed possible accommodations. (DE 27-3.) On the paperwork, in response to the request for the physician's accommodation recommendations, Dr. Beitzel wrote, "periods of scheduled rest" and "addn medical work up in progress." (*Id.*)

The ADAAA requires that C&M make a "reasonable effort to determine the appropriate accommodation." *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)(citing 29 C.F.R. § 1630 app.). Failing to request or obtain the information which would logically be required to assess Spurling's accommodation requests demonstrate that C&M either failed to engage in the process or caused a breakdown in said process. *Bultemeyer*, 100 F.3d at 1285. Accordingly, C&M's actions and inaction fall far short of the mandates of the ADAAA and case law.

Bellant denied in his deposition that Spurling made the first request, but, contrary to his testimony, he mentions the interactive process and a leave of absence in his email to Swoyer on April 16.

> Just received a phone call from Kim Spurling that she may have a medical condition that is causing this issue. I have ADA paperwork that she will have her doctor fill out to begin the interactive process regarding her ability to perform the key functions of her job safely. I will put her on

a LOA until process is completed.

(DE 27 p. 20; DE 27-20; DE 27-29 p. 5 (25).) Bellant also gave Spurling her

own letter regarding the interactive process. (DE 27-2.)

In response to Spurling's second request for accommodation via Dr. Beitzel's

paperwork, Spurling testified that when she turned in the document, Bellant

indicated that he would meet with her on April 26 for an interactive process

meeting.  (DE 22-1 p. 6; DE 27-32 p. 6 (71-72); DE 27-17 pp. 10-11.) The

meeting, however, never occurred. Accordingly, based on the evidence

including Spurling's verbal request, Dr. Beitzel's paperwork and Bellant's

email, a reasonable trier of fact could conclude that Spurling placed C&M on

notice of her disability and further requested reasonable accommodations.

For the foregoing reasons, Spurling respectfully requests this court to reverse

the trial court and find that Spurling was denied reasonable accommodations

for her disability.

### 2.    C&M Failed to Engage in the Interactive Process

Spurling argued failure of the interactive process in her motion for summary

judgment, response to defendant's motion for summary judgment and in her

motion to alter/amend judgment. (DE 22 pp. 12-16; DE 27 pp. 20-23; DE 46

pp. 8-12.) The trial court made no findings regarding this issue in its Opinion

and Order granting summary judgment to C&M, but it briefly addressed such

in its Order denying Spurling's motion to alter/amend judgment. (DE 57 p. 42.)

In that Order, the trial court improperly found, *"Bultemeyer* is inapplicable to Spurling's case unless C&M knew that she was disabled...and Spurling's singular reliance on it is misplaced." *Bultemeyer*, 100 F.3d at 1284. (DE 57 p. 42.) Spurling contends that the trial court's finding was in error and must be reversed.

C&M's internal communications incorrectly shift the analysis of the ADAAA's requirement for interactive process to an analysis of the reasonableness of the accommodations proffered by Dr. Beitzel. (DE 27-25.) Instead of meeting with Spurling, C&M analyzed and rejected Dr. Beitzel's recommended accommodations without involving Spurling or Dr. Beitzel even though Swoyer testified that he had asked for additional information from a doctor "many times" in other disability cases. (DE 22-1 pp. 6-7; DE 27-29 pp. 5-6 (27-29); DE 27-31 p. 7 (20); DE 46 p. 9; DE 27-25.) C&M, alone, bears responsibility for the breakdown in the interactive process, and is liable for such. *Beck,* 75 F.3d at 1137.

Bellant notes in his April 28, 2010 recommendation to Swoyer that Spurling had received all of the interactive process needed during her suspension meeting on April 15.

> I have met with Darrin and Kurt and we recommend the aggressive approach. Upon review of all the facts presented we feel that we did the interactive process during the progressive disciplinary process of asking if she had a medical condition to which she told us no. We even suggested if moving to a different shift would solve [Spurling's sleep issues ] to which she stated she did not want to go to a different shift.

40

> While there is an element of risk as Tom outlined, we feel we did everything during the discipline process.
>
> We do not see the conservative approach changing the situation and the recommendations from the doctor of additional breaks (she already gets two ten minute breaks and a half hour lunch) or food on the line, are not reasonable.

(DE 22-1 p. 7; DE 27-25.)

Not only did C&M fail to discuss Dr. Beitzel's accommodations with Spurling or the doctor, there is no evidence that Dr. Beitzel recommended "food on the line" as an accommodation. (*Id.*) Further, a reasonable trier of fact could conclude that Spurling had no idea that during her suspension meeting she should have been prepared with suggestions for reasonable accommodations. Spurling did not know that she might have a medical condition causing her sleepiness, nor did she fully understand from a physical aspect exactly what was happening to her. (DE 46 p. 10.) As noted several times, *supra,* according to Bellant's notes of the meeting, "she had no recollection of falling asleep or nodding out..." (*Id.*; DE 27-14.) It was C&M that believed Spurling might have a serious medical condition, and it was C&M that kept asking Spurling if her wakefulness issues could be medical in nature. (DE 24-2 pp. 19-20, 24; DE 27-31 p.6 (16-17); DE 27-31 p. 9 (27-28).) Spurling's assertions that when she turned in Dr. Beitzel's paperwork on April 21 and Bellant told her that they would meet to discuss a reasonable accommodation make perfect sense; Bellant now had confirmation of Spurling's disability. (DE 46 p. 10.) A jury

could easily arrive at the same conclusion.

As noted, in its summary judgment order, the trial court's analysis of Spurling's interactive process and reasonable accommodation claims are sparse to non existent. (DE 57 p. 27; DE 46 p. 8.)

> When viewing this case as a whole, it is clear that Spurling had a long and well-documented history of falling asleep on the job, rendering her unable to perform the duties of her position, and C&M had no idea that she was falling asleep because of a disability. Spurling was asked and denied that she had a medical condition, was warned repeatedly that she could be terminated, and waiting until she was on termination's doorstep before she sought a doctor's care or informed her employer that she might have a disability covered by the ADA. But it was too little, too late...

(DE 57 p. 27.)

The trial court was critical of Dr. Beitzel's note that Spurling was suffering from "excessive drowsiness," which it felt could "hardly be considered as shedding light on Spurling's vague Medical condition." (DE 57 p. 25.) C&M had the opportunity, however, to get more information. Bellant testified that when Spurling returned the completed medical form he did not speak with her about what she and the doctor had discussed regarding her condition or what the medical work up that was "in progress" involved. (DE 46 p.9; DE 27-29 p. 4 (20-21).)  Bellant and Swoyer also failed to call Spurling's physician for more information regarding Spurling's condition and other possible reasonable accommodations that might work. (DE 27-29 pp. 5-6 (27-29); DE 27-31 p. 7 (20). This is suspect since Swoyer testified that in his HR position he had

42

spoken with physicians "many times" regarding employee health issues. (DE 46 pp. 8-9; DE 27-31 p. 7 (20).) But perhaps C&M's inaction is not surprising; the plant manager, Claussen, testified that he had reviewed several different disability requests, but to his recollection had *never* made a reasonable accommodation for any employee who requested such. (DE 22-1 p. 7; DE 27-30 p. 2 (7).)

    Contrary to the trial court's finding in its Order denying Spurling's motion to alter/amend judgment that *"Bultemeyer* is a far cry from this case," Spurling would argue otherwise. (DE 57 p. 42.) In *Bultemeyer,* the court found that although Bultemeyer was unable to articulate his accommodation needs, the letter from his psychiatrist communicated that Bultemeyer should be given a position that was "less stressful." *Bultemeyer*, 100 F.3d at 1284. The court opined:

> If the precise meaning of this letter was unclear, FWCS could have spoken with either Bultemeyer or Dr. Fawver. Had it done this, it would have been properly engaging in the interactive process. Instead, FWCS unilaterally determined that Bultemeyer was wrong in thinking that the position at Northrop was more stressful than any other position.

*Id.*; (DE 46 p. 9.)

    The trajectory of Spurling's case with its admittedly vague note from Dr. Beitzel is surprisingly similar to Bultemeyer's. Dr. Beitzel testified via affidavit that in his opinion, based on a reasonable degree of medical certainty, Spurling was suffering from a severe sleep apnea or other medical or sleep related

problem that would be covered by the ADAAA. (DE 46 p.9; DE 29-1 ¶¶ 9, 13, 14.) That was why Dr. Beitzel referred Spurling to Dr. Sekar, a sleep specialist. According to Dr. Beitzel, he would have authorized a medical leave pursuant to the FMLA for Spurling to complete her medical testing if C&M had requested it, and he would have been "happy to discuss Kimberly's condition and treatment with a representative of her company, but I was never contacted by anyone." (*Id.* ¶¶ 15-16.)

The *Bultemeyer* decision makes clear that if the physician's statement is too vague, a phone call is in order to seek clarification. *Bultemeyer,* 100 F.3d at 1284. Further, as the *Bultemeyer* decision states in detail, the interactive process requires that "both parties bear responsibility for determining what accommodation is necessary." *Id.* at 1285; *See also, Beck,* 75 F.3d at 1135.

Spurling argued several reasonable accommodations that could have been considered by C&M. (DE 46 pp. 10-11.) What if Spurling, after speaking with her physician, agreed that a move to first shift might be the answer? What if Spurling, after speaking with her physician, was willing to try to suck on sour candy - - or something even more revolting - - to jolt her system? What if Spurling, after speaking with her physician, asked for a coworker to speak with her every 10 to 15 minutes to make sure that she was cognizant? What if Spurling, after speaking with her physician, decided that she would try to physically move and change her position while performing her packing duties

44

or sniff smelling salts kept in her pocket? What if Spurling, after speaking with her physician, asked for one extra break? C&M made a vague claim that it had production numbers to consider, but presented no evidence as to why an extra break would be unduly burdensome. What if Spurling, after speaking with her physician, reasserted her request for a medical leave - - admittedly, she never called it FMLA, but Swoyer recognized it as such - - to complete her testing to see if she could really return to her position and perform her duties to the expectations of C&M? (*Id.*; DE 27-21.)

By denying Spurling the right to participate in the interactive process to discern a reasonable accommodation, C&M violated the law. The trial court erred when it reasoned that *Bultemeyer* is a far cry from Spurling's case because Bultemeyer had a long history of disability of which his employer was well aware. (DE 57 p. 42.) Such a finding negates disability claims falling under the "perceived as" or "record of" impairment prongs of the ADAAA. For the foregoing reasons, the grant of summary judgment in favor of C&M on Spurling's claims of disability discrimination, including the interactive process and reasonable accommodation, must be reversed.

**F.    THE TRIAL COURT ERRED WHEN IT FOUND THAT C&M'S TERMINATION OF SPURLING DID NOT INTERFERE WITH SPURLING'S RIGHT TO FMLA LEAVE**

Spurling asserted in her summary judgment response and in her motion to

alter/amend judgment that C&M interfered with her rights to an FMLA leave of
absence. (DE 27 pp. 5-6; DE 27-3 p. 2; DE 46 pp. 16-18.) It is Spurling's
contention that the trial court erred when it dismissed Spurling's arguments
and drew every inference in favor of C&M when it found, repeatedly, that C&M
had no notice that Spurling was suffering from a serious medical condition.

> At the time that C&M began the process of terminating Spurling – a
> prospect that she had been warned about repeatedly – it had no notice
> that Spurling had any kind of serious medical condition, and "FMLA
> leave depends on the employer's knowledge of a qualifying condition."
> *Byrne v. Avon Prods., Inc.,* 328 F.3d 379, 381 (7th Cir. 2003).

(DE 57 p. 29, 43.) For the reasons enumerated below, and pursuant to the
unequivocal notice test, *supra,* the court's reasoning is flawed and must be
reversed.

### 1.    Spurling Was Entitled to FMLA Leave Based on Her Serious Health Condition

Spurling is able to establish an FMLA interference claim per the five-part
test enumerated in *Goelzer v. Sheboygan County, Wis.,* 604 F.3d 987, 993 (7th
Cir. 2010)(citing *Burnett v. LFW Inc.,* 472 F.3d 471, 477 (7th Cir. 2006)). (DE 27
p. 5.) The elements of the five-part test include:

> (1) Spurling was eligible for the FMLA's protections; (2) C&M is covered
> by the FMLA; (3) Spurling was entitled to take leave under the FMLA; (4)
> Spurling provided sufficient notice of her intent to take leave; and (5)
> C&M denied Spurling FMLA benefits to which she is entitled.

*Id.* There is no dispute that prongs 1 and 2 are met: Spurling worked for over
1250 hours in a 12-month period, and C&M, which employs over 50

individuals, is subject to the FMLA.  (DE 27-4 p.5, Rog. 7.)

   Contrary to the findings of the trial court, Spurling suffers from a "serious health condition" defined by 29 C.F.R. § 825.113(a) as "an illness, injury, impairment or physical or mental condition that involves...continuing treatment by a health care provider..." *Id.* The law establishes that "[t]he term "treatment" includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.113(c). "Continuing treatment" covers "chronic condition" which "[m]ay cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)" 29 C.F. R. § 825.115(c)(3).  (DE 27 p. 6.)

   The trial court's findings ignore the chronology of Spurling's case and the fact that C&M invited and assisted Spurling to present evidence which might sway C&M's decision-making process. (DE 27-14, bullet pt. 9.) According to Spurling, she requested a leave to find out why she was falling asleep when she spoke with Bellant on April 16 just prior to receiving the paperwork for Dr. Beitzel to complete. (DE 27 p. 7;DE 27-32 p. 3 (55-56); DE 46 p. 17.) Spurling was not required to request FMLA by name. *Burnett,* 472 F.3d at 478-79. Unusual behavior, such as Spurling telling HR that she did not realize that she had been asleep on-the-job, may be the basis for providing notice of the need for FMLA leave; "the employee need not mention the statute or demand its benefit." *Byrne*, 328 F.3d at 381-82.

47

In *Byrne*, the notice requirement for FMLA leave is instructive. *Id.* Byrne, a model employee who began to suffer from severe depression was not lucid enough to give notice to his employer that he needed a medical leave. *Id.* The court reasoned:

> If a person with <u>major depression</u>"…could not have told his employer about the problem and requested leave, then notice was not "feasible" and was unnecessary even if the change in behavior was not enough to alert Avon to a need for medical leave.

*Id.* at 382.

The evidence illustrates that C&M knew, or at least reasonably suspected, that Spurling's struggle with wakefulness could be a serious medical condition. (DE 46 p. 17; DE 27-5 thru DE 27-7; DE 27-9 thru DE 27-15; DE 27-19; DE 27-27.) The email chain between Swoyer and Bellant establish that as early as April 16, Swoyer was thinking that the FMLA might be implicated in relation to Spurling's discipline; "I find it interesting that…she waited until the point of termination to try to establish her eligibility for protection under either FMLA or ADA." (DE 27-21.)

Spurling returned Dr. Beitzel's medical paperwork on April 21, which gave C&M added notice regarding Spurling's medical condition as meriting ADA protection and also that additional medical testing was "in progress."  (DE 27-3 p. 2.) The additional medical testing satisfies both the 29 C.F. R. § 825.113(c) definition of "treatment" to "determine if a serious health condition exists" as well as satisfying the "continuing treatment by a health care provider"

requirement of 29 C.F.R. § 825.115. Further, Dr. Beitzel's notation that "additional medical workup in progress" should have automatically triggered an offer of FMLA leave to Spurling, per the email acknowledging the possibility of FMLA between Swoyer and Bellant. (DE 27-21.)

Spurling, a factory employee who packed Styrofoam cartons, had no medical background and did not understand what was happening to her at work - - "When given details of the incident, she had no recollection of falling asleep or nodding out even though she was told that both the employee and her supervisor yelled at her to get her attention..." (DE 27-14.) As with Byrne, it was not feasible or necessary for Spurling to alert C&M to her need for medical leave, yet Spurling did alert C&M and did request medical leave before C&M made any decision to terminate her employment.  C&M's lack of offer is all the more suspect given Bellant's admission to Swoyer that he had placed Spurling on a leave of absence "until process is completed." (DE 27-21.) Pursuant to the email, a reasonable jury could conclude that C&M technically provided Spurling with an FMLA leave. The same reasonable jury could also conclude that the leave was improperly interfered with and canceled when Spurling was terminated upon C&M's receipt of Dr. Beitzel's paperwork confirming Spurling's medical condition. (DE 27 p.7.)

C&M also had notice of Spurling's need for FMLA leave prior to her request for leave on April 16, 2010. Spurling's history of losing consciousness at work

49

is well documented in at least five separate descriptions of her behavior containing language describing activity much more serious than an employee who is merely falling asleep.  (DE 27 p. 7; DE 27-19; DE 27-27.) A reasonable trier of fact could easily and fairly interpret the emails generated by C&M management personnel, and the write ups that Spurling received, as directly related to her wakefulness issues. (DE 27-5 thru DE 27-13.) The documents detail fears for safety, whether or not Spurling was "okay," and one noted, "I saw Kimberly for [a] second time completely asleep when she was packing parts."  (DE 27-12.)

When Spurling was suspended in February 2010 for loss of consciousness issues, she turned in a doctor's return to work slip noting that her symptoms related to "passing out" should be excused at work and that she was discontinuing medication.  (DE 27-19.) C&M's rendition of the meeting states, "The doctor has since changed her medication to help with this condition." (DE 27 pp. 7-8; DE 27-11.) By April, two of C&M's supervisors noted that Spurling's condition was worsening. (DE 27 p. 8; DE 27-12.) C&M's extensive documentation of Spurling's worsening condition, coupled with her physician's Return to Work slip should have suggested, at that time, that Spurling suffered from a health condition meriting the very FMLA leave that Swoyer mentioned in his email reply to Bellant on April 16. (DE 27 p. 9; DE 27-21.)

Even if C&M did not feel that it could accommodate Spurling on-the-job, an

50

even better accommodation would have been three or four weeks off of work, pursuant to the FMLA, to finish her medical testing and get back to work with the help of Dr. Beitzel and Dr. Sekar. (DE 46 p. 18.) The trial court's finding that "Spurling did not put C&M on notice that she was requesting medical leave before C&M decided to terminate her, and C&M did not interfere with Spurling's FMLA rights" is in error, improperly construes all facts in favor of C&M and must be reversed. (DE 57 p. 30, 43.)

## CONCLUSION

By ignoring and failing to make any determination regarding the unequivocal notice test, the trial court incorrectly found that Spurling was effectively terminated via Bellant's April 16 email. This finding negated the documented string of events that transpired when Bellant assisted Spurling with her efforts to see her physician and the review of the physician's completed medical form for over a week by C&M management personnel, including its corporate counsel, prior to Bellant's second recommendation to terminate Spurling on April 28. Further, C&M failed to engage with Spurling in the interactive process to determine if a reasonable accommodation could be found and interfered with Spurling's rights to FMLA leave to finish her medical tests.

For the foregoing reasons, the trial court's denial of Spurling's motion to alter/amend judgment and its Order granting summary judgment in favor of

C&M and against Spurling must be reversed on all claims: Spurling's ADAAA disability claim, including the failure of the interactive process to work together to find a reasonable accommodation, and Spurling's FMLA interference claim. Spurling further requests that costs of this appeal be taxed against C&M.

Respectfully submitted,

/s/ Lori W. Jansen
Lori W. Jansen, Attn. # 19417-57
ROCKWELL & JANSEN LLC
812 Mill Lake Road
Fort Wayne, Indiana 46845
Phone: (260) 338-2784
Fax: (260) 338-2786
Email: lorijansen@rockwelljansen.com

No. 13-1708

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

Kimberly Spurling,
Plaintiff-Appellant,

v.

C&M Fine Pack, Inc.,
Defendant-Appellee.

_____

Appeal From The United States District Court
For the Northern District of Indiana
Case No. 1:11-cv-00039-PPS
The Honorable Judge Philip P. Simon
_____

REQUIRED SHORT APPENDIX OF
PLAINTIFF-APPELLANT, KIMBERLY SPURLING
_____

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | |
|---|---|
| KIMBERLY SPURLING,<br>Plaintiff | )<br>)<br>) |
| v. | ) CAUSE NO. 1:11 CV 39 |
| | ) |
| C&M FINE PACK, INC.,<br>Defendant. | )<br>) |

**OPINION AND ORDER**

Kimberly Spurling was employed by C&M Fine Pack as a packer/inspector on its factory line. Spurling repeatedly fell asleep on the job and was subjected to C&M's progressive discipline policy. After being warned that any further incidents of falling asleep could result in her termination, Spurling fell asleep at work again. She was suspended pending termination, and her superiors recommended that she be fired. But before C&M management formally approved Spurling's firing or communicated it to her, Spurling announced that contrary to what she had previously told C&M on numerous occasions, it was possible that she was suffering from a medical condition that was causing her to fall asleep at work. Spurling produced paperwork from her doctor which indicated that she was suffering from "drowsiness" and needed scheduled periods of rest to accommodate her drowsiness. C&M fired her nonetheless, prompting Spurling to sue under the Americans with Disabilities Act and the Family Medical Leave Act.

This matter is before the Court on the parties' cross-motions for summary judgment [DE 21; DE 23]. For the reasons explained below, the Court **DENIES** Spurling's motion for summary judgment and **GRANTS** C&M's motion for summary judgment.

54

# BACKGROUND

C&M Fine Pack[1] produces plastic packaging for the food industry [DE 24-1 at 6], and

from February 2004 to April 28, 2010, Spurling worked as an inspector and packer on C&M's

third shift, which ran from 11:00 pm to 7:20 am [DE 22-4 at 5; DE 24-1 at 6; DE 24-2 at 4, 9;

DE 24-5 at 1]. At the risk of stating the obvious, one of Spurling's responsibilities was to stay

awake while inspecting products [DE 24-5 at 2]. While she worked at C&M, Spurling also

moonlighted (or "daylighted," as it were) on another job at a Hallmark store [DE 24-2 at 7-9].

On those days, she typically worked two days a week at Hallmark for approximately four hours

before reporting to C&M [*Id*].

Early in her tenure at C&M, Spurling received some verbal disciplinary warnings and

negative or "below expectations" performance reviews [DE 24-2 at 11-17; DE 24-6 at 5, 8-9].

And as early as February 2009, C&M began to reprimand Spurling for sleeping at work [DE 22-

5; DE 24-1 at 15-16]. In June 2009 and March 2010, coworkers reported that Spurling was

having a difficult time keeping her eyes open, walking, standing, and keeping her head up,

although it does not appear that these instances resulted in formal warnings [DE 22-27 at 1, 3,

and 5]. Spurling also received warnings for "not keeping up on her line" in May and October

2009 [DE 22-6; DE 22-7; DE 22-8; DE 24-2 at 21-22]. Spurling was explicitly told in May 2009

that she needed "to make sure that she informs the supervisor about any issues that does [sic] not

allow her to do her job at an acceptable rate of speed" [DE 24-6 at 12]. And then in October

Spurling was warned that another incident of failing to keep up could "result in a written

[1]C&M Fine Pack's name is now D&W Fine Pack, LLC, but the parties' submissions all

refer to it as C&M [DE 24 at 2, n.1]. I will also refer to it as C&M.

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 16 of 44

warning including suspension up to termination of employment" [DE 22-8; DE 24-2 at 21-22;

DE 24-6 at 14].

On February 15, 2010, Spurling left her position on the line to use the restroom [DE 22-9

at 1-2; DE 24-6 at 16]. Twenty minutes later, a C&M employee found her asleep in a bathroom

stall [DE 22-9 at 1-2; DE 24-6 at 16]. Spurling was suspended and told that falling asleep at

work was a "huge concern for your safety and the safety of those working around you," and that

"future incidents of this nature will lead to further disciplinary actions up to and including

termination of your job" [DE 22-9 at 1-2; DE 22-10; DE 24-2 at 18-19, 22-23; DE 24-6 at 16].

Spurling was also warned that "[i]t is important that you get the amount of sleep your body

requires so that when you come to work you are able to stay awake and perform the necessary

tasks required by your employer" [DE 22-9 at 2; DE 22-10; DE 24-6 at 16]. Spurling's warning

explicitly stated that "it is critical that Kim understands that future issues of this kind could lead

to the termination of her job" [DE 22-10; DE 24-2 at 18-19; DE 24-6 at 16].

Darrin Claussen (the Plant Manager) and other C&M supervisors met with Spurling upon

her return from disciplinary suspension in February 2010 [DE 22-11; DE 25-2 at 2-3]. At the

meeting, Spurling said that she understood that she had been suspended because she fell asleep

while she was working [DE 22-11]. Spurling explained to her superiors that she had been using

a new medication, and that her doctor had sent a "note of explanation" and that the medication

had been changed "to help with this condition" [DE 22-11; DE 22-19; DE 24-2 at 23-24].

Spurling had been prescribed Paxil for her complaints of anxiety and depression [DE 29-1 at ¶5].

But the doctor changed her medication to Zoloft because of dizziness that led to her falling and

hitting her head. [DE 22-19; DE 29-1 at ¶6].

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 17 of 44

At the February meeting, Spurling was asked if she had a medical condition that could be

causing her to fall asleep, and she responded that she did not [DE 24-2 at 19-20, 24; DE 24-4 at

10-11; DE 25-3 at 9]. At the meeting, Claussen reminded Spurling that any more disciplinary

action would result in her termination [DE 22-11].

Less than two months later, Spurling again fell asleep at work. On the day in question,

her coworkers twice reported that she had her eyes closed and her head was down, and they had

to call her name loudly to wake her up [DE 22-12 at 1-3; DE 24-6 at 18]. Evidently, Spurling

was continually sleeping on the job because her manager reported that her sleeping had gotten

worse since the February meeting [DE 22-12 at 1].

As a result of the latest incident of her falling asleep at work again, Paul Bellant (the

plant's Human Relations Manager) met with Spurling on April 15, 2010 [DE 22-13; DE 24-2 at

27-28; DE 24-6 at 18]. At the meeting, Bellant told Spurling that she was being suspended

pending termination as part of C&M's progressive discipline practice [DE 22-13; DE 24-1 at 18;

DE 24-2 at 28-29, 38; DE 24-4 at 9; DE 24-6 at 18]. Bellant instructed Spurling that he was

going to communicate C&M's termination decision to her by April 19, 2010, and that if she had

any further information, she should contact Bellant before that date [DE 22-13; DE 24-1 at 18-

19; DE 24-6 at 18; DE 25-1 at 9; DE 25-2 at 4].

Later on April 15, Bellant wrote to Claussen, the Plant Manager, summarizing the

incident and the subsequent meeting with Spurling [DE 22-14; DE 24-3 at 7]. Bellant wrote that

57

Spurling confirmed that at the time of the February 2010 incident, "she had been taking medication at that time that made her drowsy and since then had switched her medication and the time she took it. She stated she has had no problems with being drowsy since" [DE 22-14].

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 18 of 44

According to Bellant, Spurling said that the informing employees were lying about her sleeping; they were motivated by their dislike of Spurling and they simply wanted to get her into trouble [DE 22-14]. Bellant also wrote that he asked Spurling why she was taking medication, and that Spurling responded that it was "for nerves" [DE 22-14]. Bellant wrote that he asked Spurling if she had any medical conditions that could affect her ability to do her job, and she said that she did not [DE 22-14; DE 24-4 at 7]. Bellant said that he informed Spurling that she would be receiving another disciplinary action for falling asleep, that her file contained at least three writeups

from the past year, and that she was being suspended pending C&M's final disciplinary determination, which could include termination [DE 22-14].

As the local Human Resources person, Bellant did not have the authority to fire Spurling [DE 24-4 at 6; DE 25-1 at 11]. Rather, he could only recommend termination to Jeff Swoyer, who was C&M's Vice President for Human Resources [*Id.*]. Swoyer would review the request and grant or deny it [*Id.*]. But Bellant did have the authority to suspend Spurling pending termination, and that's what he chose to do [*Id.*]. Spurling was then escorted from the building [DE 22-14].

Later that day, Spurling went to her doctor, James Beitzel, who decreased Spurling's medication [DE 29-1 at ¶¶ 8-9]. Dr. Beitzel referred Spurling to a specialist in sleep disorders,

58

and ordered blood testing and lab work [DE 29-1 at ¶¶ 10, 12].

On April 16, 2010, at 10:32 AM, Bellant wrote an email to Swoyer with the subject "Termination of Employee," outlining the process regarding termination, informing Swoyer that Bellant, Claussen, and others were recommending that Spurling be terminated, and attaching information for Swoyer's review [DE 24-6 at 20]. Later that day, Bellant wrote Swoyer another

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 19 of 44

email, with the subject "Termination of Employee Update," which included the same text as his earlier email, but added a paragraph at the end that he had "just received a phone call" from Spurling, and that she had told Bellant that she "may have a medical condition that is causing this issue" [DE 22-20]. Swoyer wrote back and noted that he found it "interesting that after all of the discussion sessions and conversations" that Spurling had "waited until the point of termination to try to establish her eligibility for protection under either FMLA or ADA" [DE 22-21]. Swoyer also questioned whether to refer Spurling's case "to counsel for guidance" [DE 22-21; DE 24-4 at 13].

Spurling returned to C&M on April 16 and asked Bellant for ADA paperwork to take to her doctor [DE 24-1 at 18-19; DE 24-2 at 29; DE 25-1 at 3, 9; DE 25-2 at 4]. Spurling also claims that at the time that she got the ADA paperwork, she requested some time off "to see what my problem was" and why she was falling asleep [DE 22-17 at 8; DE 24-2 at 32-33]. She did not request leave in writing [DE 24-2 at 33]. Bellant denies that she made any such request [DE 24-1 at 11-12; DE 25-1 at 5, 10; DE 28-2 at 12]. Bellant provided Spurling with the paperwork and instructed her that she would have to provide the information requested to determine if her claimed medical condition warranted ADA consideration [DE 24-1 at 7; DE 22-

59

2; DE 24-2 at 29]. The paperwork consisted of a standard letter to the physician requesting that

he complete the paperwork [DE 22-3 at 1], a description of Spurling's position [DE 22-3 at 3-4],

and a form for the physician to complete [DE 22-3 at 2; DE 24-1 at 7-9; 37; DE 25-1 at 3].

Spurling took the paperwork to Dr. Beitzel on April 16, and he completed the paperwork

on April 21, 2010 [DE 29-1 at ¶11]. Dr. Beitzel checked a box indicating that "yes," Spurling

had a mental or physical disability covered under the ADA, and he made a handwritten notation

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 20 of 44

that "pt has excessive drowsiness that affects her job" [DE 22-3 at 2; DE 22-17 at 5-6; DE 24-1

at 9; DE 24-6 at 22; DE 25-1 at 4]. Beitzel also indicated that Spurling "may not be able to

perform the essential job functions," but that the "reasonable accomodation" of "periods of

scheduled rest" should be considered [DE 22-3 at 2; DE 22-17 at 5-6; DE 24-1 at 11; DE 24-6 at

22; DE 25-1 at 5]. Beitzel also wrote on the form "add'n medical work up in progress" [DE 22-3

at 2; DE 24-6 at 22; DE 25-1 at 4]. The form did not diagnose Spurling with narcolepsy or

mention narcolepsy in any way [DE 24-2 at 30; DE 24-6 at 22].

When Spurling returned the paperwork on April 21, Bellant told Spurling that C&M

would review it [DE 24-1 at 9; DE 25-1 at 4]. On Friday, April 23, 2010, Bellant forwarded to

Swoyer Spurling's ADA paperwork that had been filled out by her doctor, noting that the doctor

had indicated that Spurling may not be able to perform key functions of her job [DE 22-22; DE

25-1 at 6]. Bellant and Claussen discussed the suggested accommodation, but felt that Spurling

was already being given scheduled rest in the form of her half hour lunch break and an additional

two ten-minute breaks during her shift [DE 24-1 at 11; DE 25-1 at 5]. The following day,

Bellant wrote to Swoyer that he had consulted with Spurling's superiors and that he still

recommended terminating Spurling because they had conducted an interactive process with her

during the progressive disciplinary process: they asked Spurling if she had a medical condition

that could have been causing her sleepiness and she said no; and they offered to have Spurling

move to a different shift, which she declined [DE 22-25; DE 24-2 at 35]. Bellant also noted that

the doctor's request for additional breaks was not reasonable, especially because Spurling

already had breaks on her shift [DE 22-25].

Bellant called Spurling on the telephone on April 28, 2010 and informed her that C&M

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 21 of 44

was terminating her [DE 22-15; DE 24-1 at 14; DE 24-6 at 24]. During that phone call, Spurling

mentioned the medical testing, and Bellant said that the decision had been made to terminate her

had been made at a level above Bellant [DE 25-1 at 8; DE 25-4 at 7].

It is undisputed that at the time that Spurling was terminated for repeatedly falling asleep

on the job, C&M did not know that she had been diagnosed with narcolepsy [DE 24-2 at 31, 38;

DE 25-4 at 8]. Indeed, C&M could not have known this because even Spurling didn't know it.

Spurling was repeatedly asked at her deposition when she was diagnosed with narcolepsy and

she repeatedly admitted that it wasn't until after her termination. [DE 24-2 at 6, 31, 33-34].

## DISCUSSION

### I. Spurling's ADA Claim

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The party seeking summary judgment carries the initial burden of demonstrating an

absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley &*

61

*Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific

facts showing that there is a genuine issue of material fact and that the moving party is not

entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986).

The ADA prohibits employers from discriminating against employees on the basis of

their disabilities. *Dickerson v. Bd. of Trustees of Community College Dist. No. 522*, 657 F.3d

595, 600 (7th Cir. 2011). "To establish a *prima facie* case of discrimination, a plaintiff must

show that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 22 of 44

essential functions of her job either with or without reasonable accommodation, and (3) she has

suffered from an adverse employment decision because of her disability." *Dvorak v. Mostardi*

*Platt Associates, Inc.*, 289 F.3d 479, 483 (7th Cir. 2002).

For an employer to discriminate against an employee "because of" her disability, the

employer must have knowledge of the disability. *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d

928, 931-32 (7th Cir. 1995). Common sense tells us that if an employer terminates an employee

when it "does not know of the disability, the employer is firing the employee 'because of' some

other reason." *Id.* at 932. *See also Ekstrand v. School District of Somerset*, 583 F.3d 972, 975

(7th Cir. 2009) (employer must know of the disability to be liable under the ADA).

In this case, Spurling argues that her narcolepsy was, in fact, a disability, and that she

was qualified to perform the essential functions of her job once her narcolepsy was controlled

with medication. I can set those claims aside for the moment because the issue at the heart of

this case lies in the third element of the *prima facie* case, which is essentially a question of

62

causation: did C&M fire Spurling because she was disabled or did they fire her for some other

reason? Because C&M's decision to terminate Spurling was made before it learned of her

narcolepsy, Spurling is unable to prove that she was fired "because of" her disability. So I need

not decide whether Spurling was in fact disabled or was otherwise qualified to perform her job.

There is no question that Spurling fell asleep on the job multiple times. This eventually

led to her termination when several coworkers reported that she was sleeping during her shift on

April 12, 2010. There is also no dispute that on April 15, 2010, the day that Spurling was

suspended pending termination, C&M had no knowledge of her narcolepsy or any medical

disability. Spurling first informed C&M on April 16 that she *might* have a medical condition –

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 23 of 44

contrary to what she had told C&M at her disciplinary meeting the day before. And according to

Bellant's email correspondence with Swoyer, at the time that he first recommended to Swoyer

that Spurling be terminated, she had not informed Bellant that she might have a medical

condition causing her to sleep [DE 22-20; DE 24-6 at 20]. In other words, Bellant's

recommendation to Swoyer that Spurling should be terminated was made *without* knowledge of

any potential medical condition, and thus he could not have recommended that she be terminated

"because of" her disability.

Although it was before the Seventh Circuit in a different procedural posture, *Adkins v.*

*Briggs & Stratton*, 159 F.3d 306 (7th Cir. 1998) presented a near identical set of facts as the

present case. In *Adkins*, the plaintiff was fired for repeatedly sleeping on his forklift truck and he

brought an ADA claim based on his disability of narcolepsy. *Id.* at 307. But because the

plaintiff admitted that he did not get the narcolepsy diagnosis until four months after he was

63

fired, the district court dismissed the case, reasoning that the employer could not have fired the

plaintiff because of his disability when they didn't even know that he had a disability. *Id.* The

Seventh Circuit remanded on the ground that the district court should have considered awarding

fees and costs to the employer. *Id.* at 307-08.

*Kolivas v. Credit Agricole*, 1996 WL 684167 (S.D.N.Y. Nov. 26, 1996), *aff'd,* 125 F.3d

844 (2d Cir. 1997), presents another factually analogous situation to this case. There, the

employee's supervisor made the decision to terminate him for his poor work habits, and

recommended to the company's human resources department that the employee be terminated.

*Id.* at *1-2. After that recommendation was made, but before the termination was formally

approved and the employee was officially terminated, the employee informed the employer that

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 24 of 44

he had a disability and was under a doctor's care and being treated with medication. *Id.* at *2.

The employer asked for a doctor's note, which the employee provided, but the note did not

indicate the nature of the employee's medical condition. *Id.* After receipt of the doctor's note,

the HR employee who had received the termination recommendation communicated the request

to the company's director of HR, who approved it, and the company's president finally approved

the request the following day. *Id.* The employee was then informed of his termination. *Id*. The

court found that because the employee's superior communicated her desire to terminate the

employee prior to learning that the employee was disabled, the employer "had already begun the

process to fire the plaintiff," indicating that there was not "a causal connection between the

decision to terminate [the employee] and knowledge of any disabling condition." *Id.*

This reasoning is persuasive, and it is consistent with *Hedberg*. And although the

64

*Hedberg* court cautioned that "if an employee tells his employer that he has a disability, the

employer then knows of the disability, and the ADA's further requirements bind the employer,"

the case goes on to say that if the employer begins the termination process without knowledge of

the employee's disability, the employer cannot be liable under the ADA. 47 F.3d at 932-34.

The process to terminate Spurling was well underway by the time that she informed

C&M that she might have a disability and was under a doctor's care. Recall that Spurling had

fallen asleep several times and was repeatedly warned and suspended under C&M's progressive

discipline policy. Recall as well that she was specifically warned two months earlier that if she

fell asleep on the job again, she could be fired. All of which suggests that the evidence of

causation is entirely lacking in this case.

Spurling essentially argues that under the ADA, once she notified Bellant that she *might*

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 25 of 44

have a "medical condition," the termination process was legally required to come to a halt. But

this cannot be the case. Bellant's commencement of the termination process against Spurling

before he knew that she possibly had a disability establishes that there is no causal connection

between his decision to terminate her and his knowledge of her disability. *Cf. Adkins*, 159 F.3d

at 307; *see also Canales-Jacobs v. New York State Office of Court Admin.*, 640 F. Supp. 2d 482,

499-500 (S.D.N.Y. 2009) (finding that notice to employer of plaintiff's disability on the "eve of

a hearing . . . seeking her termination" was insufficient to show that employer had notice of the

plaintiff's condition).

Moreover, the notice that C&M received on April 21, 2010, that Spurling was suffering

from "excessive drowsiness," can hardly be considered as shedding light on Spurling's vague

"medical condition." To the contrary, it only confirmed what C&M already knew: that Spurling was having a difficult time staying awake on the job. And while Dr. Beitzel did, in fact, check a box that indicated that Spurling had an ADA disability, it is clear that the process to terminate Spurling for numerous and well-documented disciplinary transgressions was well underway before Spurling returned the paperwork.

Spurling tries to make an additional argument that was flatly rejected by the *Hedberg* court: that "firing someone 'because of' the symptoms of his disability is the same as firing him 'because of' the disability itself." 47 F.3d at 931-32. "Under this theory, even if the employer knew nothing about the disability, if he knew of the symptoms and fired the employee because of them, the ADA binds him." *Id.* at 933. Spurling is correct that she was fired "because of" her sleeping on the job. But she is incorrect in arguing this is the same thing as firing her "because of" her narcolepsy, which was undiagnosed at the time of her termination. As the Seventh

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 26 of 44

Circuit explained in *Hedberg*, employers frequently fire people based on how they perform, and "[a]llowing liability when an employer indisputably had no knowledge of the disability, but knew of the disability's effects, far removed from the disability itself and with no obvious link to the disability, would create an enormous sphere of potential liability." 47 F.3d at 934. As is relevant here, poor work habits have a number of causes, "few of them based in illness," and the ADA obviously does not require that an employer who observes these poor work habits must somehow divine that the reason for the poor performance is a disability. *Id.* "The ADA hardly requires . . . an employer who has not been informed of the

66

```
disability, and who has no reason to

know of the disability . . . to retain all apparently tardy and

lazy employees on the chance that

they may have a disability that causes their behavior." Id.
```

In this case, not only was C&M not required to divine that Spurling's sleeping on the job

might be caused by a disability, it was completely reasonable in thinking that Spurling's

"wakefulness problems" were caused by an altogether more likely culprit: her schedule.

Spurling worked the graveyard shift, where workers falling asleep was not uncommon, and she

held down a second part time job at a Hallmark store, to boot. So it is not at all surprising that

C&M specifically warned Spurling that "[i]t is important that you get the amount of sleep your

body requires so that when you come to work you are able to stay awake and perform the

necessary tasks required by your employer" [DE 22-9 at 2; DE 22-10; DE 24-6 at 16]. C&M

even went so far as to offer Spurling the opportunity to change shifts to alleviate her sleeping

problems, which she refused. Moreover, Spurling repeatedly told C&M that she *didn't* have a

medical problem that could be causing her sleeping issues. Such was the situation when Bellant

– in consultation with other plant supervisors – recommended to Swoyer that Spurling be

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 27 of 44

terminated.

When viewing this case as a whole, it is clear that Spurling had a long and welldocumented

history of falling asleep on the job, rendering her unable to perform the duties of her

position, and C&M had no idea that she was falling asleep because of a disability. Spurling was

asked and denied that she had a medical condition, was warned repeatedly that she could be

terminated, and waited until she was on termination's doorstep before she sought a doctor's care

or informed her employer that she might have a disability covered by the ADA. But it was too

little, too late, because ". . . an employee cannot keep [her disability] a secret up until the

moment that he or she is in danger of being fired and expect the revelation and the threat of a

lawsuit to erase all of his or her prenotice misconduct." *Peyton v. Otis Elevator Co.*, 72 F. Supp.

2d 915, 922 (N.D. Ill. 1999).

In sum, Spurling herself didn't know that she had narcolepsy until over a month after she

was terminated from C&M. To which we ask: how, if she did not know she had a disability,

would one reasonably expect her employer to divine that fact? The evidence is plain that C&M

was entirely unaware of Spurling's disability when it decided to terminate her. Therefore,

summary judgment on the ADA claim is appropriate.

## II. Spurling's FMLA Claim

Spurling also argues that C&M interfered with her right to take FMLA leave to complete

medical testing by firing her, instead of allowing her to take FMLA leave [DE 21; DE 22 at 16].

The FMLA grants eligible employees the right to take unpaid leave for up to twelve work weeks

per year for a "serious health condition" as defined by the statute. *King v. Preferred Tech.*

*Group*, 166 F.3d 887, 891 (7th Cir. 1999). To ensure the availability of these rights, the FMLA

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 28 of 44

makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the

attempt to exercise, any right provided." *Kauffman v. Federal Exp. Corp*, 426 F.3d 880, 884 (7th

Cir. 2005), quoting 29 U.S.C. § 2615(a)(1). To prevail on an FMLA interference claim, the

plaintiff-employee must show that:

(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.

*Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 712 (7th Cir. 2009).

Spurling claims that she asked for medical leave on April 16, which C&M denies happened. For purposes of this motion for summary judgment, I will look at the evidence in the light most favorable to Spurling and credit Spurling's testimony on this point. But even assuming that she asked for time off for medical testing on April 16, 2010, Spurling's claim still fails. Assuming that Spurling was eligible for FMLA protection, and that C&M was covered by the Act, Spurling still wasn't denied rights that she was entitled to exercise.

Spurling claims that C&M denied her the right to FMLA leave to obtain medical treatment, and essentially argues that once she asked for time off for medical testing, C&M could not fire her. Instead, according to Spurling, they should have simply given her the time off to obtain medical treatment and then allowed her to come back to work. But this argument is flawed, because the FMLA "does not confer benefits to which an employee would not be entitled had the employee not taken leave." *Ogborn v. United Food and Comm. Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002). Thus, an employer may fire an employee for poor performance if she would have been fired for her performance regardless of having taken leave.

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 29 of 44

*Simpson*, 559 F.3d at 712; *see also Phelan v. City of Chicago*, 347 F.3d 679, 683 (*quoting Kohls*

*v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 805 (7th Cir. 2001)) ("...an employee may be fired for poor performance when she would have been fired for such performance even absent her leave"). Similarly, and as is relevant here, "[n]o FMLA violation occurs where an employer has already decided to terminate the employee before the employee requests FMLA leave." *Gorski v. Med. Protective Co.*, 2010 WL 4684023, at *13 (N.D. Ind. Nov. 10, 2010) (no FMLA violation where employer had begun preparing to terminate employee before employee requested FMLA leave). At the time that C&M began the process of terminating Spurling – a prospect that she had been warned about repeatedly – it had no notice that Spurling had any kind of serious medical condition, and "FMLA leave depends on the employer's knowledge of a qualifying condition." *Byrne v. Avon Prods.*, *Inc.*, 328 F.3d 379, 381 (7th Cir. 2003).

And although Spurling did not actually take leave – unlike the employee in *Simpson* – this is a distinction without a difference, for C&M surely need not have placed Spurling on FMLA leave, waited for her to return, and *then* fired her. Similarly, *Simpson*, *Phelan*, and *Kohls* foreclose Spurling's argument that Bellant writing to Swoyer that he was placing Spurling on a "LOA" (leave of absence) somehow rendered C&M unable to fire her. To the contrary, an employee can be terminated for "inappropriate work behavior" while she is at work, or while she is on FMLA leave. *Daugherty v. Wabash Ctr., Inc.*, 572 F. Supp. 2d 1003, 1014 (N.D. Ind. 2008), *aff'd*, 577 F.3d 747 (7th Cir. 2009).

Spurling argues, however, that C&M was on notice *before* April 16 that she had a serious medical condition because of her prior episodes of falling asleep at work, and that under *Byrne,*

70

328 F.3d at 381, an employee's "unusual behavior" is all that is required to put the employer on

notice that FMLA leave is needed [DE 22 at 20]. But Spurling's behavior on April 12 was far

from unusual; it was a continuing course of conduct that had been going on for over a year. A

coworker first reported that Spurling was beginning to show signs of sleeping on the job in

February 2009. Her well-documented behavior could hardly be characterized as the type of

"dramatic change in behavior" that serves as notice of a serious medical problem that was

present in *Byrne*, where a previously stellar employee suddenly began hiding in a break room

and sleeping for hours on end due to the onset of major depression. *Id.* at 382. Spurling did not

put C&M on notice that she was requesting medical leave before C&M decided to terminate her,

and C&M did not interfere with Spurling's FMLA rights.

## CONCLUSION

For the foregoing reasons, Spurling's Motion for Summary Judgment [DE 21] is

**DENIED**, and C&M's Motion for Summary Judgment [DE 23] is **GRANTED**.

**SO ORDERED.**

ENTERED: July 18, 2012

s/ Philip P. Simon
Philip P. Simon, Chief Judge
United States District Court

AO 450 (Rev. 01/09) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the
Northern District of Indiana

KIMBERLY SPURLING

Plaintiff

v. **Civil Action No.** 1:11-CV-39-PPS

C&M FINE PACK INC.

Defendants

**JUDGMENT IN A CIVIL ACTION**

The court has ordered that (*check one):*
the plaintiff
recover from the defendant the amount of
dollars $ , which includes prejudgment interest at the rate of % plus postjudgment
interest at the rate of % along with costs.
the plaintiff recover nothing, the action is dismissed on the merits, and the defendant
recover costs from the plaintiff .

*X* Other: Judgment is entered in favor of Defendant C&M Fine Pack and against Plaintiff Kimberly
Spurling.

This action was (*check one):*

tried to a jury with Judge presiding, and the jury has
rendered a verdict.
tried by Judge without a jury and the above decision was
reached.

*X* decided by Judge Philip P. Simon on Motions for Summary Judgment.

DATE: July 19, 2012 ROBERT N. TRGOVICH, CLERK OF COURT

by S/K. Middleton

*Signature of Clerk or Deputy Clerk*

72

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

KIMBERLY SPURLING,              )
Plaintiff                       )
                               )
v.                            ) CAUSE NO. 1:11 CV 39
                               )
C&M FINE PACK, INC.,          )
Defendant.                  )

## OPINION AND ORDER

Plaintiff Kimberly Spurling seeks reconsideration of the Court's Order granting C&M

Fine Pack, Inc.'s Motion for Summary Judgment [DE 46]. In that Order, I concluded that there

was no evidence that C&M knew that Spurling was disabled when it decided to terminate her for

repeatedly falling asleep on the job [DE 42]. It is true that after she was fired Spurling was

diagnosed with narcolepsy. But C&M was unaware of this at the time – indeed, even Spurling

herself didn't know of her affliction. Spurling now claims that the Court drew inferences in

C&M's favor and failed to consider all of the arguments that she raised at the summary judgment

stage, and so she wants the judgment amended. Because I remain convinced that an employer

cannot discriminate against someone for a disability that both the employer and the employee are

unaware of, the motion to amend the judgment is **DENIED**.

First, some background: a motion for reconsideration may be brought "to correct

manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de

Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir.1996); *see also Publishers Res.,

Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (motions for

reconsideration cannot be used to introduce evidence that could have been presented at the summary judgment stage). Such motions cannot be used to introduce new evidence or legal

theories that could have been presented earlier or relitigate old theories already presented to the court. *Caisse Nationale*, 90 F.3d at 1269.

Spurling's complaint alleged three claims under the Americans with Disabilities Act Amendment Act[1], 42 U.S.C. § 12111, *et seq*.: disability discrimination, failure of the interactive process and failure to provide reasonable accommodations. She also brings a claim under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq*., for interference with Spurling's FMLA rights. In the present motion, Spurling does not raise any newly discovered evidence. Rather, she claims that the Court "improperly analyze[d] Spurling's claims under a straight disability theory" and did not properly address her contentions that she met the "regarded as" and "record of" prongs of the ADA. Spurling also argues that the Court ignored evidence that C&M's conduct after Spurling's superior initially recommended termination demonstrated that the initial recommendation was being reconsidered, so that the decision was ultimately made after it knew that she had a disability. Spurling also complains that the Court failed to consider *Bultemeyer v. Fort Wayne Comm. Schools*, 100 F.3d 1281, 1283 (7th Cir. 1996), and her argument that C&M discriminated against her by firing her instead of engaging in an interactive process and working with her on a reasonable accommodation [DE 46 at 2-3]. Finally, Spurling argues that the Court improperly dismissed her FMLA interference claim.

## I. The Discrimination Claim

### A. C&M had no knowledge of Spurling's disability when it initiated her

**termination.**

Spurling argues that she pleaded in her complaint that she was not only disabled, but that

[1]For ease of reference, even though the Act has been amended, I will continue to use the

shorthand "ADA.

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 34 of 44

she was "regarded as" disabled by C&M and that C&M had a "record of" her disability [DE 46

at 2-3]. 42 U.S.C. § 12102(1)(A)-(C). She argues that the Court's order put in place a diagnosis

requirement that essentially dispatches with the "regarded as" and "record of" prongs of the

ADA [DE 46 at 3]. The central issue in this case is whether Spurling suffered an adverse

employment decision *because of* her disability; this is a question of causation [*see* DE 42 at 8-9,

*citing Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002)]. An employer

cannot discriminate against an employee "because of" the employee's disability unless the

employer has knowledge of the disability. *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928,

931-32 (7th Cir. 1995); *see also, e.g., Crandall v. Paralyzed Veterans of America*, 146 F.3d 894,

896-97 (D.C. Cir. 1994) ("courts of appeals have overwhelmingly agreed that for this casual link

to be shown the employer must have acted with an awareness of the disability itself, and not

merely an awareness of some deficiency in the employee's performance that might be a product

of an unknown disability") (collecting both Rehabilitation Act and ADA cases); *Morisky v.

Broward County*, 80 F.3d 445, 447-49 (11th Cir. 1996) (citing *Hedberg*, rejecting the "contention

that a plaintiff can sustain a prima facie case of handicap discrimination without proof that an

employer had actual or constructive knowledge of an applicant's disability"); *Hammon v. DHL

Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (finding that where plaintiff failed to inform

employer that he had a disability, plaintiff could not satisfy the *prima facie* requirements of ADA claim).

So the Court's analysis focused not on whether Spurling was, in fact, disabled, or if she was qualified to perform the essential functions of her job once her narcolepsy was controlled

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 35 of 44

with medication [DE 42 at 9].[2] Rather, it focused on whether C&M fired Spurling "because" she was disabled.

Much of Spurling's motion recites the same arguments that she raised in her motion for summary judgment. The argument goes that because C&M knew that she was repeatedly falling asleep on the job, that it must have been aware of her disability and fired her because of that disability. To be sure, Spurling's employment file was replete with documentation regarding incidents where she fell asleep on the job. But as discussed in the Court's opinion, C&M's knowledge that Spurling was falling asleep on the job does not equate to knowledge that Spurling had a disability [DE 42 at 13]. The Seventh Circuit explained at length in *Hedberg* that firing someone because of the *symptoms* of a disability is not the same as firing someone because of the disability itself. 47 F.3d at 933-34; *see also Crandall*, 146 F.3d at 896-97 (for causation purposes, an employer must have acted with knowledge of the disability itself, not just with knowledge of a problem with the employee's work that could be caused by an potential unknown disability). In *Hedberg*, the Court held that "[t]he ADA hardly requires that merely because some perceived tardiness and laziness is rooted in disability, an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all

[2] To this point, Spurling attempts to distinguish a number of cases that the Court relied

upon because they interpreted the Americans with Disabilities Act, and not the Americans with

Disabilities Amendments Act of 2008 (the "ADAAA"). The ADAAA expanded the definition of

"major life activities" – which would come into play if there was some question as to whether

Spurling was in fact disabled – but did not impact the notice requirement of the ADA.

*Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 606, n.3 (7th Cir. 2012) ("...the ADAAA

broadened the ADA's protection by superseding portions of *Sutton v. United Air Lines, Inc.*, 527

U.S. 471 (1999) and *Toyota Motor Manf'g. v. Williams*, 534 U.S. 184 (2002) to, inter alia,

include a wider range of impairments that substantially limit a major life activity"). As outlined

above, C&M's *knowledge* of her disability is the question at issue in Spurling's case, not

whether she was substantially limited in a major life activity.

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 36 of 44

apparently tardy and lazy employees on the chance that they may have a disability that causes

their behavior." 47 F.3d at 934.

This is entirely sensible. To accept Spurling's argument would mean that an employer

who has an employee regularly sleeping on the job must take an affirmative step to find out if the

sleeping is being caused by a disability, but such a requirement puts the onus on the wrong party.

It is the employee's responsibility to notify the employer of the disability; not the other way

around. *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) ("An

employee has the initial duty to inform the employer of a disability").

Here, while it is true that C&M knew that Spurling was falling asleep on the job, there is

no evidence that at the time the initial termination recommendation was made – or even through

the many months that Spurling was warned that she could be fired if she continued to fall asleep

on the job – that C&M knew that Spurling had a disability. Her sleepiness alone, especially

when viewed in conjunction with the fact that Spurling worked the night shift and a second

daytime job as well, was not enough to tip off C&M to her disability.

Spurling contends that this somehow places a diagnosis requirement on her, which

inappropriately eliminates the "record of" and "regarded as" prongs of the ADA [DE 46 at 2-3,

5-6]. I disagree. Spurling argued in her original briefing that she had a "record of" a physical

impairment because of the paperwork that she submitted from her doctor to C&M on April 21,

2010 [DE 22 at 7]. But as noted in the Court's opinion, the doctor's note wasn't received until

*after* the wheels had begun turning on Spurling's dismissal – which means that the April 21

"record" of her disability couldn't have been the reason for Spurling's termination [DE 42 at 12].

Spurling also argues that she had a "record of" a disability as early as February 25, 2010,

because she submitted a note from her doctor that said that she "was recently asked to

discontinue medicine related to her passing out – please excuse symptoms @ work 2/15/10 &

2/16/10" [DE 26 at 2]. But consider the context. Spurling had been prescribed Paxil for her

complaints of anxiety and depression, and her doctor changed her prescription because Spurling

experienced dizziness that led to her falling and hitting her head [DE 42 at 3-4]. Bellant even

asked Spurling why she was taking the medication, and Spurling told him that it was "for

nerves" [DE 42 at 5]. In fact, Spurling was specifically asked if she had a medical condition that

could be causing her to fall asleep, and she responded that she did not [DE 42 at 4-5]. The

February 2010 incident was for a medical condition completely different than Spurling's

narcolepsy, so the attendant documentation can't establish that C&M had a record of Spurling

78

having narcolepsy and can't establish that Spurling was fired because she had a disability.

Finally, Spurling argues that the notations in her personnel file about her falling asleep on

the job, and in particular the summary of the April 15, 2010 incident where she fell asleep for the

last time, suffice to serve as a "record of" her disability [DE 46 at 4]. Again, Spurling is correct

that her file was replete with documentation regarding incidents where she fell asleep on the job,

which were discussed at length in the Court's opinion [DE 42 at 2-4]. But again, the Court has

already considered and rejected the argument that C&M's knowledge that Spurling was falling

asleep on the job equates to knowledge that Spurling had a disability [DE 42 at 13]. *Hedberg*, 47

F.3d at 933-34.

As to the "regarded as" prong, Spurling argued in her summary judgment papers that the

documented safety warnings she received after falling asleep on the job indicate that C&M

"regarded" her as having an impairment [DE 22 at 8-9]. Spurling
also argued that C&M
regarded her as having a disability because she told C&M, after
they suspended her pending
termination, that she "might" have a medical condition, and that
Swoyer acknowledged this
when he wrote in an email that "I find it interesting that after
all of the discussion sessions and
conversations along the way that she waited until the point of
termination to try to establish her
eligibility for protection under either FMLA or ADA" [DE 22 at

79

9]. Finally, she argued that the

April 21, 2010 doctor's note established that she was "regarded

as" having a disability [DE 22 at

9].

Once again, these arguments have already been raised and

rejected. As discussed above,

the notations in Spurling's personnel file don't indicate that

C&M regarded Spurling as having a

disability. Rather, they indicate that Spurling had a long and

well-documented history of

snoozing on the job. This was despite several warnings and

despite C&M's offer to allow her to

change shifts to fix the problem. To repeat: firing an employee

because of the *effects* of the

disability, without an obvious link to a debilitating condition, does not subject an employer to

liability under the ADA. *Hedberg*, 47 F.3d at 934 [DE 42 at 12-13]. Moreover, the information

that Spurling provided about a potential disability *after* the April 15 disciplinary meeting, where

Spurling was placed on suspension pending termination, and *after* Bellant's April 15 email

recommending that Spurling be terminated for repeatedly sleeping on the job is not evidence that

C&M fired Spurling *because of* her disability; Bellant recommended that Spurling be terminated

prior to receipt of the information.

**B. C&M's actions after Spurling informed it that she "might" have a disability**

Spurling also argues that the Court has misconstrued the evidence of the parties' behavior

80

following Spurling's notification to C&M that her sleeping might be caused by a medical

condition. In particular, Spurling takes issue with the Court's analysis of the termination

process, and claims that the events that transpired following Spurling's placement on suspension

pending termination and Bellant's recommendation that she be terminated, starting with

Spurling's revelation to C&M that she might, after all, have a medical condition that was causing

her to fall asleep at work, are evidence that C&M did in fact fire her "because of" her disability.

Spurling essentially makes the same argument that I rejected at the summary judgment stage:

that despite months of warnings that falling asleep on the job could subject her to termination,

and finding herself in that precise situation, once she indicated to C&M that she might have a

medical condition, the termination proceedings were required to come to a halt [DE 42 at 11-12].

Spurling now argues that the Court neglected to consider evidence that C&M had

information during the time it was mulling over the process of terminating Spurling that

indicated that Spurling had a disability [DE 46 at 4-8]. Spurling presents no new evidence in

support of this argument. Rather, she argues that the Court improperly weighed the evidence

regarding C&M's actions after Spurling gave them notice that she might have a disability [DE

46 at 6-7]. She claims that if the facts are construed in the light most favorable to her, Bellant

and Swoyer's subsequent communications indicate that Bellant somehow withdrew his initial

termination recommendation, and that C&M knew that Spurling was disabled for seven days

while it "toyed with . . . the decision to terminate" [DE 46 at 7].

But the evidence that C&M had internal discussions about whether to follow through on

Bellant's initial recommendation that Spurling be fired, after it received Spurling's ADA

paperwork, does not change the fact that "Bellant's recommendation to Swoyer that Spurling

should be terminated was made *without* knowledge of any potential medical condition, and thus

he could not have recommended that she be terminated 'because of' her disability" [DE 42 at

10]. Spurling argues that the cases cited and relied upon by the Court – *Hedberg*, *Adkins v.*

*Briggs & Stratton*, 159 F.3d 306 (7th Cir. 1998), and *Kolivas v. Credit Agricole*, 1996 WL

684167(S.D.N.Y. 1996) – can be distinguished from her case because Bellant extended Spurling

a "life-line . . . by offering the employee extra time to confer with her physician" [DE 46 at 12].[3]

But Spurling never explains how C&M's actions after Spurling informed C&M that she

had a medical condition somehow set her case apart from the cases that the Court relied upon.

And Spurling doesn't cite a single case in support of her argument that C&M's actions in giving

her paperwork to take to her doctor somehow had to bring the termination process to a grinding

halt. Although she disputes that the termination process was "in the works for a long period of

time" [DE 46 at 6], the evidence is clear that she was warned multiple times over a period of

months that continuing to fall asleep on the job could result in termination, that she was told that

she was being suspended pending termination, that Bellant recommended to his superiors that

she be terminated, and that ultimately, C&M approved the recommendation and terminated

Spurling. Contrary to Spurling's contention, there is simply no evidence that Bellant ever

"abrogated" his initial recommendation to terminate Spurling. Rather, the evidence is that C&M

did, in fact, follow through on that recommendation, which was lodged when the company had

[3]As noted by C&M, each of these cases was cited in its summary judgment briefing and Spurling

failed to address them at the time, despite having the opportunity to do so [DE 50 at 5]. Spurling now

82

attempts, for the first time, to argue that these cases are not applicable to her. Spurling should have raised

these arguments at the summary judgment stage, which "is not a dress rehearsal or practice run; it 'is the

put up or shut up moment in a lawsuit.'" *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th

Cir. 2005) (*quoting Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 41 of 44

no knowledge that Spurling was suffering from a disability.

The bottom line is that Spurling was warned for months that if she continued to fall

asleep on the job, she would be terminated. During that time, Spurling denied that she had a

medical condition that could be causing her sleepiness. Only after she fell asleep on the job

again and was told that she was being suspended pending termination, and Bellant did, in fact,

recommend that she be terminated, did Spurling indicate for the first time that she might have a

disability. Because Spurling's termination was in the works before C&M learned that she had a

disability, it cannot be said that C&M fired her *because of* her disability. *Kolivas*, 1996 WL

684167, at *3-5 (irrelevant that final decisionmaker did not officially approve supervisor's initial

termination decision until after plaintiff provided information about medical condition), *aff'd*,

125 F.3d 844 (2d Cir. 1997); *Canales-Jacobs v. New York State Office of Court Admin.*, 640 F.

Supp. 2d 482, 499-500 (S.D.N.Y. 2009) (no causal connection between plaintiff's disability and

termination when first notice of disability was on eve of termination hearing and after plaintiff

was warned and progressively disciplined).

But let's assume for the moment that the doctor's note somehow required C&M to stop

the presses, brought the termination proceedings to a halt for re-evaluation in light of the

doctor's claims, and somehow abrogated Bellant's recommendation. Spurling's claim would

still fail because it hinges upon a note from her doctor that is altogether uninformative. It is true that Dr. Beitzel checked a box that said that she had a mental or physical disability covered under the ADA. But in describing Spurling's condition, Dr. Beitzel merely wrote that "pt has excessive drowsiness that affects her job" [DE 22-3]. This was not exactly a news flash to C&M. This note merely told C&M what it already well knew. A rote conclusion in a doctor's

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 42 of 44

note that an employee is "disabled" is not enough, especially when it comes in the 11th hour. As one court put it: "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996). Dr. Beitzel's cursory note was simply not enough, in light of Spurling's long history of sleeping at work and her previous denial that she had a medical problem, to provide notice to C&M that Spurling was disabled at the time that it terminated her.

## II. The Reasonable Accommodation and Interactive Process Claims

Spurling argues in her motion, as she did in her summary judgment briefing, that the case most closely analogous to hers is *Bultemeyer v. Fort Wayne Comm. Schools*, 100 F.3d 1281 (7th Cir. 1996). But *Bultemeyer* is a far cry from this case. In *Bultemeyer*, the plaintiff had a long and documented history of bipolar disorder and paranoid schizophrenia, which his employer was fully aware of and for which the employer had offered him accommodations in the past. *Id.* at 1284. Indeed, *Bultemeyer* makes clear that the threshold inquiry in a reasonable accommodation case is whether the employer was *aware of the disability*. 100 F.3d at 1284. The question of whether the employer in *Bultemeyer* knew about the plaintiff's disability was undisputed: it did.

84

*Id.* In other words, *Bultemeyer* is inapplicable to Spurling's case unless C&M knew that she was

disabled. This Court has determined that when C&M started the termination process, it did not

know that Spurling was disabled, and even when Spurling returned the paperwork from her

doctor indicating that she was having "excessive drowsiness," the information was so vague that

C&M wasn't on notice that Spurling was disabled. Accordingly, *Bultemeyer* is inapplicable

here, and Spurling's singular reliance on it is misplaced.

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 43 of 44

### III. The FMLA Claim

Spurling also argues that *Byrne v. Avon Prods., Inc.*, 328 F.3d 379 (7th Cir. 2003),

governs the FMLA issues in this case. But again, the Court's finding that Spurling has not

presented evidence that C&M fired her because of her disability means that summary judgment

in C&M's favor is appropriate on this claim, as "FMLA leave depends on the employer's

knowledge of a qualifying condition." *Byrne*, 328 F.3d at 381. And as thoroughly explained in

the Court's opinion, the facts of *Byrne* stand in sharp contrast to Spurling's case [DE 42 at 16-17

("Spurling argues . . . that under *Byrne*, 328 F.3d at 381, an employee's 'unusual behavior' is all

that is required to put the employer on notice that FMLA leave is needed . . . [b]ut Spurling's

behavior on April 12 was far from unusual; it was a continuing course of conduct that had been

going on for over a year")].

As noted in the Court's previous opinion [DE 42 at 16], "[n]o FMLA violation occurs

where an employer has already decided to terminate the employee before the employee requests

FMLA leave." *Gorski v. Med. Protective Co.*, 2010 WL 4684023, at *13 (N.D. Ind. Nov. 10,

2010) (no FMLA violation where employer had begun preparing to terminate employee before

employee requested FMLA leave). Spurling presents no new arguments in her motion to amend

the judgment that were not raised in her briefing on the summary judgment motions. Because

C&M did not know that Spurling was disabled at the time it began the termination process, there

was no violation of the FMLA.

case 1:11-cv-00039-PPS document 57 filed 04/04/13 page 44 of 44

### CONCLUSION

For the foregoing reasons, Spurling's Motion to Alter/Amend Judgment [DE 46] is

**DENIED.**

**SO ORDERED.**

ENTERED: February 21, 2013

s/ Philip P. Simon
Philip P. Simon, Chief Judge
United States District Court

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. RULE 32(a)(7)(B)(i)

Comes now Lori W. Jansen, counsel of record for Plaintiff/Appellant, and hereby certifies

that, according to the word processing program (WordPerfect 12) utilized by the undersigned in

preparation of this Appellant's Brief, the total word count is 12,690 in compliance with the

14,000 word count limitation of Fed. R. App. 32(a)(7)(B)(i).

Dated:    June 17, 2013


 /s/ Lori W. Jansen
Lori W. Jansen, Attn. # 19417-57



Rockwell & Jansen, LLC
Attorneys for Plaintiff-Appellant
812 Mill Lake Road
Fort Wayne, Indiana 46845
Telephone: (260) 338-2784
Fax: (260) 338-2786
Email: lorijansen@rockwelljansen.com

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

I, Lori W. Jansen, certify that all of the materials required by Circuit Rule

30(a) and (b) are contained in the Short Appendix.


Dated: June 17, 2013


/s/ Lori W. Jansen
Lori W. Jansen, Attn. # 19417-57




Rockwell & Jansen, LLC
Attorneys for Plaintiff-Appellant
812 Mill Lake Road
Fort Wayne, Indiana 46845
Telephone: (260) 338-2784
Fax: (260) 338-2786
Email: lorijansen@rockwelljansen.com

## CERTIFICATE OF SERVICE

**Certificate of Service when All Case Participants are CM/ECF Participants**

I hereby certify that on June 17, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Lori W. Jansen

89